UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Case No. 0:24-cv-61939-LEIBOWITZ

PHILIP SERPE,

     Plaintiff,

v.

FEDERAL TRADE COMMISSION; AND
HORSERACING INTEGRITY AND
SAFETY AUTHORITY, INC.,

     Defendants.

_____

**DEFENDANT HORSERACING INTEGRITY AND SAFETY AUTHORITY, INC.'S
OPPOSITION TO PLAINTIFF'S EXPEDITED MOTION FOR SUMMARY
JUDGMENT AND MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR
SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................II

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

LEGAL STANDARD...................................................................................................... 11

ARGUMENT................................................................................................................... 11

I.   THIS COURT LACKS JURISDICTION. .......................................................... 11

   A.   This Court Lacks Jurisdiction Under *Thunder Basin*. ........................... 12

     *1.*   Thunder Basin *governs Plaintiff's claims.*.................................. 12

     *2.*   *The* Thunder Basin *factors weigh against this Court's review.*................ 13

     *3.*   *Plaintiff does not challenge "final" agency action.* ................................ 15

   B.   Plaintiff's Claims Are Not Ripe.......................................................... 16

II.   THE ENFORCEMENT ACTION AGAINST PLAINTIFF DOES NOT VIOLATE THE PRIVATE NONDELEGATION DOCTRINE. ......................................... 17

   A.   The Authority And HIWU Are Subordinate To The FTC.................................. 17

   B.   Plaintiff's Challenge Rests On A Caricature Of The Authority-FTC Relationship. .............................................................................. 19

III.   THE ARBITRATION AND SUBSEQUENT FTC PROCEEDINGS DO NOT RUN AFOUL OF THE SEVENTH AMENDMENT........................................... 23

   A.   Plaintiff Waived Any Seventh Amendment Challenge. ....................................... 24

   B.   The Seventh Amendment Does Not Apply To Plaintiff's Proceedings Before The Arbitrator Or The FTC.......................................................... 29

     *1.*   *The Seventh Amendment was not implicated by the Arbitration.* ............ 29

     *2.*   *The Seventh Amendment has not been implicated by the FTC's review.* ..................................................................... 30

   C.   The Banned Substance Claim Concerns A Public Right. ...................................... 31

     *1.*   *The Banned Substance claim is based on technical standards unknown to the common law.*................................................ 32

     *2.*   *Adjudication of anti-doping rules has historically taken place outside courts of law.* ................................................... 36

     *3.*   *Plaintiff's counterarguments are not persuasive.*.................................... 37

IV.   THIS COURT NEED NOT STEP IN TO ISSUE PERMANENT INJUNCTIVE RELIEF.................................................................................... 39

CONCLUSION................................................................................................................ 39

## TABLE OF AUTHORITIES

C<small>ASES</small>:

*Abbott Laboratories v. Gardner*,
    387 U.S. 136 (1967)..................................................................................................17

*Alpine Sec. Corp. v. FINRA*,
    121 F.4th 1314 (D.C. Cir. 2024)........................................................................22, 23

*American Heritage Life Ins. Co. v. Orr*,
    294 F.3d 702 (5th Cir. 2002) ...............................................................................28

*AT&T, Inc. v. FCC*,
    149 F.4th 491 (5th Cir. 2025) ...............................................................................35
    2026 WL 73092 (U.S. Jan. 9, 2026) .....................................................................35

*Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n*,
    430 U.S. 442 (1977)........................................................................................37, 38

*Axalta Coating Sys. LLC v. Federal Aviation Admin.*,
    144 F.4th 467 (3d Cir. 2025) ..................................................................... *passim*

*Axon Enter., Inc. v. FTC*,
    598 U.S. 175 (2023)..............................................................................13, 14, 15

*Bakrac, Inc. v. Villager Franchise Sys., Inc.*,
    164 F. App'x 820 (11th Cir. 2006) .......................................................................26

*BBX Cap. v. FDIC*,
    956 F.3d 1304 (11th Cir. 2020) ...........................................................................11

*Blankenship v. FINRA*,
    No. CV 24-3003, 2024 WL 4043442 (E.D. Pa. Sept. 4, 2024) ..................13, 14, 16

*Burks v. Wisconsin Dep't of Transp.*,
    464 F.3d 744 (7th Cir. 2006) ...............................................................................31

*Caley v. Gulfstream Aerospace Corp.*,
    428 F.3d 1359 (11th Cir. 2005) .......................................................24, 26, 27, 28

*Cooper v. MRM Inv. Co.*,
    367 F.3d 493 (6th Cir. 2004) ...............................................................................27

*CSI Aviation Servs., Inc. v. United States Dep't of Transp.*,
    637 F.3d 408 (D.C. Cir. 2011)..............................................................................15

*D.L. Cromwell Invs., Inc. v. NASD Regul., Inc.*,
    279 F.3d 155 (2d Cir. 2002)..................................................................................30

*Desiderio v. National Ass'n of Secs. Dealers, Inc.*,
  191 F.3d 198 (2d Cir. 1999)..................................................................................24, 29, 30

*Elgin v. Department of Treasury*,
  567 U.S. 1 (2012)........................................................................................................13

*FCC v. Consumers' Rsch.*,
  606 U.S. 656 (2025).............................................................................................. *passim*

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010)....................................................................................................13

*Gilmer v. Interstate/Johnson Lane Corp.*,
  500 U.S. 20 (1991)......................................................................................................27

*Gordon v. New York Stock Exch., Inc.*,
  422 U.S. 659 (1975)....................................................................................................18

*Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*,
  921 F.3d 1343 (11th Cir. 2019) ..............................................................................29, 39

*Harris v. Mexican Specialty Foods, Inc.*,
  564 F.3d 1301 (11th Cir. 2009) .................................................................................39

*Horseracing Integrity & Safety Auth., Inc. v. National Horsemen's Benevolent &
  Protective Ass'n*,
  145 S. Ct. 2837 (2025)..................................................................................................5

*Husky Int'l Elecs., Inc. v. Ritz*,
  578 U.S. 355 (2016)....................................................................................................34

*In re Checking Acct. Overdraft Litig.*,
  856 F. App'x. 238 (11th Cir. 2021) .............................................................................25

*In re Peterson*,
  253 U.S. 300 (1920)....................................................................................................31

*Itel Cap. Corp. v. Cups Coal Co.*,
  707 F.2d 1253 (11th Cir. 1983) .................................................................................31

*Jarkesy v. SEC*,
  803 F.3d 9 (D.C. Cir. 2015) .......................................................................................12

*Jones v. SEC*,
  115 F.3d 1173 (4th Cir. 1997) ...................................................................................30

*Kim v. FINRA*,
  698 F. Supp. 3d 147 (D.D.C. 2023) ...........................................................................30

*Koveleskie v. SBC Cap. Mkts., Inc.*,
    167 F.3d 361 (7th Cir. 1999) ...............................................................24, 25, 28, 29

*Manis v. USDA*,
    796 F. Supp. 3d 178 (M.D.N.C. 2025) ...............................................................34, 35

*Maron v. Chief Fin. Officer of Fla.*,
    136 F.4th 1322 (11th Cir. 2025) .......................................................................16

*Millennia Hous. Mgmt. v. HUD*,
    783 F. Supp. 3d 1051 (N.D. Ohio 2025)..............................................................14

*NCRNC, LLC v. Kennedy*,
    786 F. Supp. 3d 496 (N.D.N.Y. 2025)............................................................14, 15

*Oklahoma v. United States*,
    62 F.4th 221 (6th Cir. 2023) ...........................................................................5
    145 S. Ct. 2836 (2025)...................................................................................5
    163 F.4th 294 (6th Cir. 2025) ................................................................. *passim*

*Pittman v. Cole*,
    267 F.3d 1269 (11th Cir. 2001) .......................................................................16

*Scott v. Horseracing Integrity & Safety Auth.*,
    No. 2:25-cv-632-SMD-GJF, 2025 WL 2987598 (D.N.M. Oct. 22, 2025) .............................11

*SEC v. Jarkesy*,
    603 U.S. 109 (2024)............................................................................. *passim*

*Seila L. LLC v. CFPB*,
    591 U.S. 197 (2020)....................................................................................20

*Simfa Rose Pharma. Specialty, Inc. v. Bondi*,
    No. 0:23-cv-61531, 2025 WL 2717151 (S.D. Fla. Sep. 24, 2025) ..................................35, 37

*Sun Valley Orchards, LLC v. United States Dep't of Labor*,
    148 F.4th 121 (3d Cir. 2025) ......................................................................32, 33

*Sunshine Anthracite Coal Co. v. Adkins*,
    310 U.S. 381 (1940)..................................................................................1, 17

*Sydnor v. Conseco Fin. Serv. Corp.*,
    252 F.3d 302 (4th Cir. 2001) .........................................................................24

*Thomas v. Union Carbide Agric. Prods. Co.*,
    473 U.S. 568 (1985)...................................................................................28

iv

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) ..................................................................................................... *passim*

*Tull v. United States*,
   481 U.S. 412 (1987) ..................................................................................................31, 38

*United States v. Cordoba-Hincapie*,
   825 F. Supp. 485 ...............................................................................................................34

*United States v. Rivera*,
   613 F.3d 1046 (11th Cir. 2010) ......................................................................................16

*Vape Cent. Grp. v. FDA*,
   No. 24-cv-3354-RDM, 2025 WL 637416 (D.D.C. Feb. 27, 2025) ........................................14

*Walmsley v. FTC*,
   117 F.4th 1032 (8th Cir. 2024) ..........................................................................................5
   145 S. Ct. 2870 (2025) ........................................................................................................5

*Woebse v. Health Care & Ret. Corp. of Am.*,
   977 So. 2d 630 (Fla. Dist. Ct. App. 2008) ......................................................................26

<u>**STATUTES:**</u>

5 U.S.C.
   § 704 ..............................................................................................................................4, 12

9 U.S.C.
   § 2 ......................................................................................................................................27

15 U.S.C.
   § 78s(b) ............................................................................................................................18
   § 78s(c) ............................................................................................................................18
   § 78s(d) ............................................................................................................................18
   § 78s(e) ............................................................................................................................18
   § 3051 ................................................................................................................................4
   § 3052 ................................................................................................................................4
   § 3052(a) ...........................................................................................................................4
   § 3053 ..................................................................................................................4, 19, 26
   § 3053(c) .........................................................................................................................17
   § 3053(e) ...............................................................................................................4, 17, 20
   § 3054 ..........................................................................................................................4, 12
   § 3054(a)(2) ....................................................................................................................12
   § 3054(c) ..............................................................................................................4, 19, 27
   § 3054(c)(1)(A) ..........................................................................................................17, 20
   § 3054(c)(2) ...........................................................................................................4, 17, 20
   § 3054(d)(2) ....................................................................................................................27
   § 3054(j)(1) .....................................................................................................................26

15 U.S.C. (cont.)

§ 3055.................................................................................................................4
§ 3055(a)(1) .......................................................................................................17
§ 3055(c)(1) .......................................................................................................33
§ 3055(g)(3)(B) ..................................................................................................26
§ 3056.................................................................................................................4
§ 3056(b)(6) .......................................................................................................17
§ 3056(b)(7) .......................................................................................................17
§ 3056(b)(8) .......................................................................................................17
§ 3056(b)(9) .......................................................................................................17
§ 3057..........................................................................................................4, 12
§ 3057(c)(1) .......................................................................................................17
§ 3057(d) ............................................................................................................17
§ 3058..........................................................................................................4, 12
§ 3058(a) .....................................................................................................4, 8, 12
§ 3058(b) .......................................................................................................4, 12
§ 3058(b)(1) .........................................................................................................8
§ 3058(b)(3) .......................................................................................................18
§ 3058(b)(3)(B) .........................................................................................4, 12, 15
§ 3058(c) .......................................................................................................4, 12
§ 3058(c)(3) .........................................................................................................4
§ 3058(d) .....................................................................................................4, 9, 12
§ 3059.................................................................................................................4
§ 3060.................................................................................................................4

49 U.S.C.
§ 5103(b)............................................................................................................33

FLA. STAT. § 550.0251(10) (2024)...........................................................................36

LA. STAT. ANN. §§ 4:224, 49:955, 49:964(F) (2022) ................................................37

Pub. L. No. 116-260, div. FF, tit. XII, § 1201, 134 Stat. 1182, 3252 (2020)
    (codified as amended at 15 U.S.C. §§ 3051-3060) .......................................................4

W. VA. CODE §§ 19-23-14(b), 19-23-16(f)................................................................37

## OTHER AUTHORITIES:

16 C.F.R.
§ 1.148(b).................................................................................................4, 9, 12, 18

47 C.F.R.
 § 54.705.................................................................................................................21
 § 54.707(a)............................................................................................................21
 § 54.719(a)............................................................................................................21
 § 54.719(b)............................................................................................................22
 § 64.2010(a)..........................................................................................................35

166 CONG. REC. H4981 (daily ed. Sept. 29, 2020) ........................................................3

166 CONG. REC. S5514 (daily ed. Sept. 9, 2020)............................................................3

88 Fed. Reg. 5,070 (Jan. 26, 2023) .................................................................................5

88 Fed. Reg. 27,894 (May 3, 2023) .................................................................................5

FED. R. CIV. P. 56(a) .....................................................................................................11

FLA. ADMIN. CODE R.75-3.001(2) ...............................................................................36

FTC, *Order Approving the Anti-Doping and Medication Control Rule Proposed
 by the Horseracing Integrity and Safety Authority* (Mar. 27, 2023)............................5

HELERINGER, ROBERT L., EQUINE REGULATORY LAW (2012) .......................................36

H.R. REP. NO. 116-554 (2020)........................................................................................3

Horseracing Integrity and Safety Authority
 Rule 1020 ..............................................................................................................6
 Rule 3010(e)(1).................................................................................................5, 17
 Rule 3030 ..............................................................................................................6
 Rule 3111(a)(1)(iii).............................................................................................36
 Rule 3132(a).........................................................................................................19
 Rule 3132(c).........................................................................................................19
 Rule 3212 ...................................................................................................7, 34, 35
 Rule 3212(a).....................................................................................................6, 34
 Rule 3223(b).........................................................................................................19
 Rule 3224 ............................................................................................................34
 Rule 3225 ............................................................................................................34
 Rule 3247(a)(1).....................................................................................................19
 Rule 7020 ..............................................................................................................6
 Rule 7030 ............................................................................................................19
 Rule 7410(a).........................................................................................................26

*In re Shell*,
 FTC Docket No. 9439 (Mar. 6, 2025) ....................................................................15

RESTATEMENT (THIRD) OF TORTS: LIAB. FOR PHYSICAL AND EMOTIONAL HARM
 § 6 (2010)..............................................................................................................35

RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECONOMIC HARM § 18 (2020)................................35

Sayre, Francis Bowes, *Public Welfare Offenses*, 33 COLUM. L. REV. 55, 78 (1933) ...................34

## INTRODUCTION

Five years ago, the President signed bipartisan legislation establishing a framework for uniform health-and-safety regulation of thoroughbred horseracing to curb the tragic deaths, severe injuries, and diminished public trust that had threatened the national pastime.  Since then, the sport has experienced record-low fatalities and record-high purses.  The Horseracing Integrity and Safety Act of 2020 ("Act" or "HISA") charges the Federal Trade Commission ("FTC") with its implementation, and the FTC in turn draws on the expertise and resources of the Horseracing Integrity and Safety Authority, Inc. ("Authority"), a private nonprofit organization, subject to the FTC's "'pervasive' oversight and control."  *Oklahoma v. United States (Oklahoma II)*, 163 F.4th 294, 312 (6th Cir. 2025) (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388 (1940)).  Any sanction imposed by the Authority is subject to "the FTC's 'say-so,'" ensuring that "'in the relationship between the two'—the FTC and the Horseracing Authority—the FTC 'dominates.'"  *Id.* at 310-311 (quoting *FCC v. Consumers' Rsch.*, 606 U.S. 656, 693, 695 (2025)).

Plaintiff's motion for summary judgment seeks to prevent the FTC from exercising that "say-so"—while at the same time arguing that the FTC should exercise greater oversight.  Plaintiff has twice come to this Court seeking an injunction against the same administrative enforcement action against him.  Twice, this Court has rejected Plaintiff's requests.  Plaintiff comes now for the third time seeking to enjoin the still-ongoing proceedings—this time permanently.  The Court should deny that motion for multiple reasons.

*First*, Plaintiff's latest request suffers the same threshold (and fatal) flaw as his first two: It is premature.  In HISA, Congress laid out a two-layered scheme of FTC review of disciplinary actions by the private Authority: *de novo* review in the first instance by an Administrative Law Judge ("ALJ"), and then *de novo* review by the Commissioners themselves.  Only then can a

1

challenger seek review of the final agency action in federal court. As this Court previously recognized, "Serpe's constitutional challenge [is] squarely at issue in the administrative proceedings." ECF No. 65, at 22. Because the FTC is presently considering the very claims Plaintiff raises here, including critical predicates to those claims entailing application of the regulatory scheme, this Court lacks jurisdiction over them.

*Second*, even if this Court were permitted to hear Plaintiff's claims, Plaintiff waived them when he agreed to abide by the private Authority's enforcement rules and procedures. Having assented to the disciplinary process as "a prerequisite to his and [his horse's] participation" in the race in question, ECF No. 65, at 27, he cannot turn around and collaterally attack that process.

*Third*, Plaintiff's private-nondelegation challenge fails on the merits. All the challenged actions by the Authority and the Horseracing Integrity and Welfare Unit ("HIWU")—a private entity tasked with enforcing the Authority's anti-doping and medication control rules—were taken pursuant to FTC-approved rules. The FTC had the power to step in at all times at its discretion. And the sanctions imposed by the Arbitrator were subject to two layers of *de novo* FTC review. In fact, the FTC showed just how closely it was monitoring the administrative proceedings—and how readily it could act—by promptly staying, *sua sponte*, the only fine ever imposed against Plaintiff. That is more than sufficient to show that the FTC remains "in control," which is what "matters to the constitutional inquiry." *Consumers' Rsch.*, 606 U.S. at 695.

*Fourth*, Plaintiff's Seventh Amendment claim is equally meritless. As Plaintiff acknowledges, the only remedy that could trigger the Seventh Amendment in his proceedings is a monetary fine. But everyone agrees that HIWU did not seek a fine before the Arbitrator and the Arbitrator never imposed one. On appeal to the FTC's ALJ, Plaintiff raised no issues of fact nor contested his liability. No jury is necessary in those circumstances. In any event, the Banned

Substance claim against Plaintiff derives from technical standards unknown to the common law and concerns a public right, meaning it can be adjudicated outside of an Article III court and without a jury.

Plaintiff's motion for summary judgment should be denied, and Defendants' cross-motions for summary judgment should be granted.

## BACKGROUND

1.  "[A] beloved tradition in the United States since the early days of the Republic," horseracing is a fixture of American culture and a "major source of jobs and economic opportunity." 166 CONG. REC. H4981-4982 (daily ed. Sept. 29, 2020) (statement of Rep. Barr). Over the last decade, however, "the joy of the races [wa]s marred by accidents that endanger[ed] both the horses and the riders." *Id.* at H4980 (statement of Rep. Pallone). Thoroughbreds died from race-related injuries at a fatality rate two-to-five times greater than in Europe or Asia. H.R. REP. NO. 116-554, at 17 (2020). These casualties sparked investigations by officials, concern within the industry, and "even call[s] for this sport to be abolished altogether." 166 CONG. REC. S5514 (daily ed. Sept. 9, 2020) (statement of Sen. McConnell). At the heart of these troubles was a "patchwork system" of state-by-state regulatory schemes that led to "wide disparit[ies]" in standards and enforcement. 166 CONG. REC. H4981 (statement of Rep. Tonko).

In 2020, a broad coalition of stakeholders rallied around "bipartisan, bicameral progress" toward finally remedying the "tragedies on the track." 166 CONG. REC. S5514-5515 (daily ed. Sept. 9, 2020) (statement of Sen. McConnell). The congressional effort culminating in the Act was not only cheered by animal-welfare proponents, but also hailed by "limited government conservative[s]" who sought a framework for "smarter, more effective, and streamlined regulation for the industry"—sorely needed given that the "lack of uniformity ha[d] impeded interstate commerce." 166 CONG. REC. H4982 (statement of Rep. Barr). President Trump signed the Act

3

into law later that year.  Pub. L. No. 116-260, div. FF, tit. XII, § 1201, 134 Stat. 1182, 3252 (2020) (codified as amended at 15 U.S.C. §§ 3051-3060).

The Act leverages the expertise of the Authority, a private standards-setting nonprofit organization, subject to "[FTC] oversight."  15 U.S.C. §§ 3052(a), 3053.  The Authority may propose rules (or rule modifications), which the FTC alone may approve, reject, or revise.  *Id.* §§ 3053, 3054(c)(2).  And the FTC can in turn "abrogate, add to, and modify the rules *** as the Commission finds necessary or appropriate."  *Id.* § 3053(e).  The Authority can then investigate and discipline rule violations pursuant to FTC-approved "procedures and rules."  *Id.* §§ 3054(c), 3057.

If the Authority determines that there has been a rule violation, the Authority must "promptly submit to the [FTC] notice of the civil sanction."  15 U.S.C. § 3058(a).  That sanction "shall be subject to de novo review" by an FTC-appointed ALJ.  *Id.* § 3058(b). The ALJ's decision is then subject to review by the Commissioners themselves.  *Id.* § 3058(c).  The FTC applies a *de novo* standard to both "the factual findings and conclusions of law"; may "allow the consideration of additional evidence"; may "affirm, reverse, modify, set aside, or remand for further proceedings"; and may "make any finding or conclusion that, in the judgment of the [FTC], is proper and based on the record."  *Id.* § 3058(c)(3).  The ALJ or the Commissioners may stay any sanction pending review by the agency.  *Id.* § 3058(d); 16 C.F.R. § 1.148(b).  And the FTC's decision is a final agency action subject to Article III review.  5 U.S.C. § 704; *see* 15 U.S.C. § 3058(b)(3)(B).

This framework—which is modeled after and mirrors the 80-year-old relationship between the Securities and Exchange Commission ("SEC") and Financial Industry Regulatory Authority ("FINRA") established in the Maloney Act—has repeatedly withstood constitutional scrutiny.  The

Sixth and Eighth Circuits initially upheld the Act across the board. *See Oklahoma v. United States*, 62 F.4th 221 (6th Cir. 2023) (*Oklahoma I*); *Walmsley v. FTC*, 117 F.4th 1032 (8th Cir. 2024). The Fifth Circuit, for its part, declared the Act's enforcement provisions facially unconstitutional under the private nondelegation doctrine, but the Supreme Court in October 2024 granted the Authority's emergency application for a stay of the Fifth Circuit's outlier mandate. *See Horseracing Integrity & Safety Auth., Inc. v. National Horsemen's Benevolent & Protective Ass'n*, No. 24A287 (U.S. Oct. 28, 2024). The Supreme Court then granted, vacated, and remanded all three circuit court decisions in light of its decision in *FCC v. Consumers' Research*, 606 U.S. 656 (2025). *See Horseracing Integrity & Safety Auth., Inc. v. National Horsemen's Benevolent & Protective Ass'n*, 145 S. Ct. 2837 (2025) (mem.); *Oklahoma v. United States*, 145 S. Ct. 2836 (2025) (mem.); *Walmsley v. FTC*, 145 S. Ct. 2870 (2025) (mem.).

In December 2025, the Sixth Circuit—taking a "second look at the Act" post-*Consumers' Research* after new briefing and oral argument on remand—unanimously rejected the private-nondelegation attack. *Oklahoma II*, 163 F.4th at 301. The Fifth and Eighth Circuit appeals remain pending.

**2.** Pursuant to the Act, the FTC in 2023 approved the Authority's proposed Anti-Doping and Medication Control Rules and Regulations, which are known collectively as the ADMC Program. *See* 88 Fed. Reg. 5,070 (Jan. 26, 2023) (FTC Notice of Horseracing Integrity and Safety Authority (HISA) Proposed Rule and Request for Comment); FTC, *Order Approving the Anti-Doping and Medication Control Rule Proposed by the Horseracing Integrity and Safety Authority* (Mar. 27, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/P222100CommissionOr derAntiDopingMedication.pdf; 88 Fed. Reg. 27,894 (May 3, 2023) (FTC Notice of Final Rule, effective May 22, 2023). HISA Rule 3010(e)(1) establishes that HIWU is to enforce the ADMC

5

Program "on behalf of the Authority" and under FTC supervision.  Under HISA Rule 7020, HIWU charges are initially adjudicated by a neutral arbitrator, subject to the FTC-review process described above.

The ADMC Program includes a list of "Banned Substances"—the most dangerous category of regulated substances that are generally prohibited at all times.  Under the relevant Rule, a "Responsible Person" has a "duty . . . to ensure that no Banned Substance is present in the body of his or her Covered Horse(s)."  HISA Rule 3212(a).  A "Responsible Person" includes a licensed "Trainer of the Covered Horse."  HISA Rules 1020, 3030.  Accordingly, the trainer of a horse covered by the Act is "strictly liable for any Banned Substance or its Metabolites or Markers found to be present in a Sample collected from his or her Covered Horse(s)."  HISA Rule 3212(a).

**3.**  Plaintiff is a professional horse trainer.  *See* Joint Statement of Undisputed Material Facts ("JSUMF") ¶ 1.  As a Covered Person under the Act, Plaintiff registered with the Authority via a portal on the Authority's website prior to entering a horse that he trains, Fast Kimmie, into a race on August 10, 2024.  JSUMF ¶¶ 3, 8.  In so doing, Plaintiff affirmatively "[a]ccept[ed]" the Authority's "Covered Persons Agreement," which provides that the registrant "agree[s] to be subject to and comply with the rules, standards, and procedures developed by HISA and approved by the [FTC]."  JSUMF ¶¶ 6-8 (third alteration in original).  The Authority's website contains links to all HISA rules.  *See* Defendants' Supplemental Statement of Material Facts ("DSMF") ¶ 42.

On August 10, 2024, Fast Kimmie won a race at Saratoga Race Course in Upstate New York.  JSUMF ¶ 10.  After the race, HIWU personnel collected samples of Fast Kimmie's blood and urine.  *Id.* ¶ 11.  Two different tests conducted at two different ADMC Program laboratories detected Clenbuterol, a Banned Substance, in the urine samples.  *Id.* ¶¶ 12-13, 20.

In October 2024, HIWU, acting on behalf of the Authority and subject to the FTC's oversight, charged Plaintiff with violating HISA Rule 3212. JSUMF ¶ 21. Before it was even clear what (if any) sanction might result from the private arbitration that Plaintiff had agreed would resolve HIWU's allegation in the first instance, Plaintiff filed this lawsuit raising claims under the Seventh Amendment and the private nondelegation doctrine. Plaintiff moved to preliminarily enjoin Defendants "from taking any action against him to enforce [HISA] or the rules promulgated under HISA." ECF No. 10-1 at 1.

In light of the Supreme Court's then-pending consideration of certiorari petitions concerning parallel private-nondelegation claims, this Court limited briefing on Plaintiff's preliminary injunction motion to his Seventh Amendment challenge. At the hearing on Plaintiff's motion, the Court suggested that "there couldn't possibly be a Seventh Amendment violation" if HIWU told Plaintiff that civil monetary penalties were "off the table" for the Arbitration. JSUMF ¶ 27. Accepting that suggestion, HIWU notified Plaintiff that it would not seek a monetary fine for the alleged banned substance violation. JSUMF ¶ 29.

Following supplemental briefing relating to HIWU's notice, ECF Nos. 45, 46, 48, the Court denied Plaintiff's motion for a preliminary injunction. ECF No. 49. The Court denied Plaintiff's motion with prejudice as to the Authority because "Plaintiff fail[ed] to show irreparable harm." *Id.* at 2, 16. And the Court denied Plaintiff's motion without prejudice as to the FTC because his "claim as to the FTC [wa]s not ripe." *Id.* at 2. At that point in time, before the private arbitration, the Court "c[ould] not know *** what specific facts w[ould] be before the FTC, or whether a civil monetary fine or any other sanctions w[ould] be imposed against [Plaintiff] at all." *Id.* at 17.

**4.** Without acknowledging (let alone contesting) HIWU's decision not to seek a fine, Plaintiff's subsequent briefing to the Arbitrator argued that any fine "should be . . . eliminated."

DSMF ¶ 43.  HIWU, in turn, made clear that it did not seek any monetary penalty.  *Id.* ¶ 44. Consistent with the notice filed with this Court, HIWU sought only equitable relief: Disqualification of the relevant race results and attendant forfeiture and redistribution of winnings, a two-year period of Ineligibility from HISA-covered activities, and Public Disclosure.  *Id.*

In June 2025, the Arbitrator held a hearing, at which both Plaintiff and HIWU presented evidence and oral argument.  JSUMF ¶¶ 30-31; DSMF ¶ 45.  In July, the Arbitrator found Plaintiff liable for violating the relevant Banned Substance Rule and imposed the equitable consequences HIWU had requested.  JSUMF ¶¶ 34-38.  The Arbitrator did not impose any fine, noting "HIWU could have also sought its legal fees and the fees of the Arbitrator and the arbitration institution as well as the statutory fine permitted for these cases but it declined to do so."  *Id.* ¶ 37.

Consistent with the Act, the Authority provided notice to the FTC of the three equitable sanctions imposed by the Arbitrator.  DSMF ¶ 50; *see* 15 U.S.C. § 3058(a).  Invoking the provision of the Act that contemplates *de novo* review by an FTC-appointed ALJ "[w]ith respect to [those] final civil sanction[s] imposed by the Authority, on application by . . . a person aggrieved by the civil sanction[s]," 15 U.S.C. § 3058(b)(1), Plaintiff noticed an appeal, *see* JSUMF ¶ 40.  But Plaintiff's notice made clear that he did not dispute any facts—or "challenge the Arbitrator's findings of fault" at all.  ECF No. 50 at 7; DSMF ¶¶ 51-53.  Nor did Plaintiff contest the sanctions the Arbitrator actually imposed.  DSMF ¶ 54.

Instead, Plaintiff challenged before the ALJ only the *absence* of a sanction, complaining that the Authority's Rules "required the Arbitrator to impose a mandatory minimum fine against [Appellant]."  DSMF ¶ 55.  Plaintiff's application to the ALJ stated, however, that the "ALJ may not *** impose [a] fine on *de novo* review."  *Id.* ¶ 56.  The Authority agreed that the ALJ could not impose a fine in the first instance.  *Id.* ¶ 57.

8

Although the FTC's regulations allow a request to the ALJ to stay the Arbitrator's sanctions (including the two-year suspension) pending FTC review, 16 C.F.R. § 1.148(b); *see* 15 U.S.C. § 3058(d), Plaintiff made no stay request throughout the duration of the ALJ proceedings, DSMF ¶ 61. Instead, Plaintiff renewed his motion for a preliminary injunction in this Court the same day that he filed his application for review by the ALJ. *See* ECF No. 50.

Before this Court acted on Plaintiff's renewed motion, the ALJ issued its decision. JSUMF ¶ 41. The ALJ upheld the (unchallenged) sanctions imposed by the Arbitrator and—against the wishes of both the Authority and the Plaintiff—imposed an additional $25,000 penalty. *Id.* ¶¶41-44. It then considered the merits of Plaintiff's Seventh Amendment argument, concluding that the Banned Substance claim was so alien to the common law as to render the Seventh Amendment inapplicable, and that "HIWU's enforcement action fell within the public rights exception to the Seventh Amendment, under which the adjudication and enforcement of certain rights may be assigned to a non-Article III tribunal or otherwise tried without a jury." ECF No. 65 at 15 (citing ECF No. 58-1 at 85, 92-93); JSUMF ¶ 46.

Plaintiff did not appeal the ALJ's decision. Instead, as this Court recognized, "[a]lmost immediately after the ALJ issued its opinion, the FTC exercised its authority to conduct a *sua sponte* review and *stayed the civil fine imposed against [Plaintiff]* pending its review." ECF No. 65 at 15-16 (citing ECF No. 59-1 at 2-3); JSUMF ¶ 47. Plaintiff moved for clarification of the FTC's order, noting that he had not "identified any error for appeal." DSMF ¶ 58; JSUMF ¶ 48. In response, the FTC directed the parties to brief (1) whether the ALJ was authorized to impose a fine not imposed by the Arbitrator and never requested by any party to the proceeding; (2) whether the fine was appropriate under the circumstances; and (3) whether the Seventh Amendment guaranteed Plaintiff a jury trial in federal court. JSUMF ¶ 49.

9

In October 2025, this Court denied Plaintiff's renewed motion, focusing mainly on the lack of irreparable harm. ECF No. 65. Because Plaintiff had thus far "declined to request a stay of his suspension in the administrative proceeding," any harm he incurred from the suspension was of his own making. *Id.* at 21. As for the ALJ's fine, the Court noted that the FTC had stayed it pending review and that, in any event, Plaintiff had conceded "that enforcement of the fine was never imminent, even in the absence of the FTC's stay." *Id.* at 24. Further, at that point in the proceedings, it was "entirely uncertain whether the FTC [would] side with the ALJ." *Id.* (citing ECF No. 56 at 11). Finally, as to the merits, the Court explained that Plaintiff had not shown a likelihood of success because he failed to "explain how his Seventh Amendment claim withstands his assent to the Covered Person Agreement—a prerequisite to his and Fast Kimmie's participation in the August 10, 2024, horserace at Saratoga." *Id*. at 27.

More than a month later, in December 2025, Plaintiff for the first time requested that the FTC stay the two-year suspension imposed by the Arbitrator and affirmed by the ALJ. JSUMF ¶ 51; DSMF ¶ 61. He also requested leave to brief (1) whether Article III entitled him to a federal court forum; (2) whether HIWU's actions violated the private nondelegation doctrine; and (3) whether HIWU's actions violated his due process rights. JSUMF ¶ 50. Before the FTC ruled on the requests, Plaintiff filed in the FTC proceedings his opening brief, which included arguments on the three additional issues. *Id.* ¶ 53. The FTC thus declared Plaintiff's request for leave to brief those issues moot, while reserving decision on Plaintiff's stay request. *Id.* ¶ 54; DSMF ¶ 62.

In January 2026, Plaintiff once again asked the FTC to consider additional issues—this time related to new evidence Plaintiff asked to introduce. JSUMF ¶ 55. This was the first time Plaintiff sought to raise any factual argument or contest his liability before the FTC. In the same motion, Plaintiff renewed his stay request. *Id*. The FTC denied Plaintiff's request as to the new

evidence and arguments.  As to the new evidence, Plaintiff "had ample opportunity" to present the evidence earlier to the ALJ and to the Commissioners themselves but provided no "reasonable grounds" for failing to do so, despite being "ably represented by counsel throughout [the FTC] proceedings."  DSMF ¶ 64.  As to Plaintiff's request to expand the scope of review, the FTC held that Plaintiff "all but abandoned any argument about his liability before the ALJ."  *Id.* ¶ 63.  The FTC, however, did not dispose of Plaintiff's stay request, noting that request "remains under consideration."  JSUMF ¶ 58.

While Plaintiff and the Authority were filing briefs in the FTC proceedings, Plaintiff filed the present motion for summary judgment in this Court covering two of the same claims that the FTC is reviewing: whether the ongoing enforcement action violates (i) the private nondelegation doctrine and (ii) the Seventh Amendment.  *See* ECF No. 83.

## LEGAL STANDARD

"Summary judgment is proper if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *BBX Cap. v. FDIC*, 956 F.3d 1304, 1314 (11th Cir. 2020) (quoting FED. R. CIV. P. 56(a)).

## ARGUMENT

I.     **THIS COURT LACKS JURISDICTION.**

Plaintiff's challenge implicates *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), which holds that a statute's comprehensive administrative-review scheme precludes federal court review of a "pre-enforcement" challenge.  *See Scott v. Horseracing Integrity & Safety Auth.*, No. 2:25-cv-632-SMD-GJF, 2025 WL 2987598, *8 (D.N.M. Oct. 22, 2025).  Like the statutory scheme at issue in *Thunder Basin*, HISA channels objections to enforcement actions through a special administrative review process.  And the factors outlined in *Thunder Basin* all indicate that Plaintiff's challenge must proceed through and complete that review before he can pursue an action

11

in this Court on the claims at issue.  At a minimum, the same analysis confirms that Plaintiff's as-applied claims are not yet ripe and that his facial claims fail on the merits.

### A.   This Court Lacks Jurisdiction Under *Thunder Basin*.

*1.*   Thunder Basin *governs Plaintiff's claims.*

As Plaintiff concedes, "HIWU arbitrations are the first step in a congressionally mandated administrative process for adjudicating violations of federal law."  Pl's Br. 34 (citing 15 U.S.C. § 3058).  That is exactly what *Thunder Basin* addresses.

The Act's "scheme of [FTC] adjudication and ensuing judicial review resembles in material respects the enforcement scheme the Supreme Court found exclusive in *Thunder Basin*." *Jarkesy v. SEC*, 803 F.3d 9, 16 (D.C. Cir. 2015).  The Act sets forth a comprehensive review process by which the FTC, the Authority, and HIWU are to exercise "exclusive national authority" over matters covered by the Act.  15 U.S.C. § 3054(a)(2).  The Act provides that the Authority (or HIWU, acting on behalf of the Authority) investigates and disciplines rule violations in the first instance, subject to FTC oversight.  *Id.* §§ 3054, 3057.  If the Authority determines through private arbitration that there has been a rule violation, the Authority must "promptly submit to the [FTC] notice of the civil sanction."  *Id.* § 3058(a).

The sanctioned party then has 30 days to seek *de novo* review by an FTC-appointed ALJ. 15 U.S.C. § 3058(b).  The ALJ's decision is, in turn, subject to *de novo* review by the Commissioners themselves.  *Id.* § 3058(c).  The ALJ or the Commissioners may stay any sanction pending review.  *Id.* § 3058(d); *see* 16 C.F.R. § 1.148(b).  And the Act specifies that only an unappealed ALJ decision or a Commission decision qualifies as a "[f]inal decision."  15 U.S.C. § 3058(b)(3)(B).  That "final decision" constitutes "final agency action" subject to review under the Administrative Procedure Act, 5 U.S.C. § 704, demonstrating that Congress meant to preclude federal district court review until after completion of the administrative process (and the

12

preceding HIWU arbitration). *Cf. Blankenship v. FINRA*, No. CV 24-3003, 2024 WL 4043442, at *1 (E.D. Pa. Sept. 4, 2024) (holding that "because FINRA's adjudicative proceedings are subject to review by the SEC under a special statutory scheme described in the Securities Exchange Act, these FINRA proceedings are subject to the Supreme Court's holdings in *Axon* and *Thunder Basin*," and dismissing case that raised Seventh Amendment claim).[1]

> 2. *The* Thunder Basin *factors weigh against this Court's review.*

The next question is whether the Act's review scheme reaches Plaintiff's particular claims. *Thunder Basin* outlined three considerations to guide this inquiry: whether (1) "precluding district court jurisdiction [could] 'foreclose all meaningful judicial review' of the claim"; (2) "the claim [is] 'wholly collateral to [the] statute's review provisions'"; and (3) "the claim [falls] 'outside the agency's expertise.'" *Axon*, 598 U.S. at 186 (third alteration in original) (quoting *Thunder Basin*, 510 U.S. at 212-213). All three factors strongly suggest that the FTC proceedings displace this Court's concurrent review of the very claims Plaintiff is pressing before the agency.

*First*, precluding federal court jurisdiction over the current lawsuit will not foreclose meaningful judicial review of Plaintiff's claims. Courts across the country have directly rejected Plaintiff's argument that "[i]f this claim is not considered now, [his] right 'not to undergo' (what is left of) a juryless proceeding in a non-Article III tribunal will be 'effectively lost.'" Pl's Br. 29

---

[1] Although the Act does not vest federal courts of appeals with "exclusive" jurisdiction for reviewing the FTC's "final decision," that does not dictate *Thunder Basin*'s applicability. While direct "review in a court of appeals following the agency's own review process" is the "method" Congress "typically chooses," it is not Congress's only method. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023). The Act "sets out" in "painstaking detail *** the method for covered [persons] to obtain review of adverse [enforcement] actions." *Elgin v. Department of Treasury*, 567 U.S. 1, 11-12 (2012). And "[g]enerally, when Congress creates procedures designed to permit agency expertise to be brought to bear on particular problems, those procedures are to be exclusive." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (internal quotation marks omitted).

(quoting *Axon*, 598 U.S. at 192). Plaintiff's Seventh Amendment claim is effectively "a challenge to [a] specific remedy"—a monetary penalty—differentiating this case from *Axon*. *Millennia Hous. Mgmt. v. HUD*, 783 F. Supp. 3d 1051, 1064-1065 (N.D. Ohio 2025). That penalty is not presently in effect and may never be. *See id.* And if it is, an Article III court can "invalidate" it after completion of agency proceedings. *Id.* at 1065; *see also NCRNC, LLC v. Kennedy*, 786 F. Supp. 3d 496, 505 (N.D.N.Y. 2025) (collecting cases); *Axon*, 598 U.S. at 190 ("Review of agency action in a court of appeals can alone 'meaningfully address[]' a party's claims."). Likewise, at that time an Article III court can review and, if need be, invalidate the sanctions if it determines that the FTC has not properly "retain[ed] decision-making power," *Consumers' Rsch.*, 606 U.S. at 692—a determination that should be informed by the FTC's own review proceedings.

*Second*, Plaintiff's claims are not "wholly 'collateral'" to the challenged enforcement proceedings. *Thunder Basin*, 510 U.S. at 212. The Seventh Amendment is not even implicated if the FTC decides no fine was properly imposed or even on the table in the ALJ proceedings. And the FTC's own actions, such as its *sua sponte* decision to immediately stay the fine imposed by the ALJ, bear directly on Plaintiff's private-nondelegation argument regarding the adequacy of the agency's oversight. Plaintiff's claims thus "depend on"—and cannot be collateral to—"[the administrative] proceedings and the interpretation of [the Act and the Rules]." *Blankenship*, 2024 WL 4043442, at *3; *see also, e.g.*, *Vape Cent. Grp. v. FDA*, No. 24-cv-3354-RDM, 2025 WL 637416, at *8 (D.D.C. Feb. 27, 2025) ("the applicability—or inapplicability—of the Seventh Amendment is inextricably intertwined with administrative process"); *NCRNC*, 786 F. Supp. 3d at 507 (same); *Millennia*, 783 F. Supp. 3d at 1066 (similar).

*Third*, Plaintiff's challenge is not "outside the agency's expertise." *Thunder Basin*, 510 U.S. at 212. FTC proceedings under HISA have involved constitutional claims. *See, e.g.*, ALJ

Decision 40-42, *In re Shell*, FTC Docket No. 9439 (Mar. 6, 2025) (determining "Rule 3214 is not unconstitutionally vague" (formatting altered)), *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/612947.2025.03.06_administrative_law_judge_dec ision_on_application_for_review.pdf. In fact, the ALJ considered Plaintiff's Seventh Amendment claim extensively, JSUMF ¶ 46, and Plaintiff himself is pressing that claim and the private-nondelegation claim to the Commissioners, JSUMF ¶ 49; DSMF ¶ 59. So even Plaintiff seems to recognize that his constitutional claims are "intertwined with or embedded in matters on which the [FTC is] expert"—*i.e.*, the remedies sought and the elements of claims pursued in Authority enforcement proceedings, and the extent of the FTC's oversight of the Authority's enforcement activities. *Axon*, 598 U.S. at 195; *see also NCRNC*, 786 F. Supp. 3d at 507 (framing third *Thunder Basin* factor as whether claim "raises a pure question of constitutional law, 'detached from considerations of agency policy'"). Indeed, the FTC's review "might shed light on the constitutional question or 'obviate the need' for judicial review." *NCRNC*, 786 F. Supp. 3d at 507.

### 3. Plaintiff does not challenge "final" agency action.

Accordingly, Plaintiff is required to wait until the FTC issues a "final decision" before filing suit in this Court. 15 U.S.C. § 3058(b)(3)(B). Plaintiff's concession that "the Commission has yet to issue a final decision," Pl's Br. 28, directly refutes his odd suggestion that there has been "final agency action" in this case, Pl's Br. 11 n.2. The ongoing FTC proceedings involve the *exact same* constitutional arguments that Plaintiff raises here, which undermines any suggestion that the agency has "taken a definitive legal position concerning its statutory authority." Pl's Br. 11 n.2 (quoting *CSI Aviation Servs., Inc. v. United States Dep't of Transp.*, 637 F.3d 408, 412 (D.C. Cir. 2011)). Plaintiff's argument that the FTC "already imposed" a fine that had a "significant practical burden" on him only proves that point, Pl's Br. 11 n.2: Although the ALJ issued a fine, that

15

sanction never took practical effect before the Commissioners stepped in and stayed it pending their full review.

As a result, this Court lacks jurisdiction under *Thunder Basin*.  The Court should "dismiss the case." *Blankenship*, 2024 WL 4043442, at *3.[2]

### B.      Plaintiff's Claims Are Not Ripe.

These same considerations confirm that, even if *Thunder Basin* did not control, Plaintiff's challenges are not ripe for judicial adjudication.  If the FTC were to rule in Plaintiff's favor on either his Seventh Amendment or private-nondelegation claim, both of which remain pending in the administrative proceeding, there would be no remaining relief for this Court to grant.  And the FTC's determination of whether any monetary penalty is even in play under the regulatory scheme will inform any federal court adjudication.  Plaintiff's claim thus depends on speculation about how the administrative proceedings will play out.  *See Maron v. Chief Fin. Officer of Fla.*, 136 F.4th 1322, 1332 (11th Cir. 2025) ("[A] claim is not ripe if it 'rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" (quoting *United States v. Rivera*, 613 F.3d 1046, 1050 (11th Cir. 2010))).  Even if just as a prudential matter, this Court should wait. *See Pittman v. Cole*, 267 F.3d 1269, 1278 (11th Cir. 2001) ("[T]he basic rationale of the ripeness doctrine is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt

---

[2] Plaintiff's jurisdictional problem in the present suit will remain even after the FTC renders its final decision.  That decision (regardless of its outcome) will supersede the agency action Plaintiff challenges in his motion—the ALJ's intermediate decision to impose a fine and otherwise affirm the Arbitrator's decision.  And Plaintiff's Complaint—filed well before the Arbitration—does not address any of these decisions (by the Arbitrator, the ALJ, or the Commissioners).

in a concrete way by the challenging parties." (alterations omitted) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-149 (1967))).

## II.   THE ENFORCEMENT ACTION AGAINST PLAINTIFF DOES NOT VIOLATE THE PRIVATE NONDELEGATION DOCTRINE.

### A.   The Authority And HIWU Are Subordinate To The FTC.

Even if the Court could reach the merits of Plaintiff's claims, Plaintiff's private-nondelegation challenge would fail.  The Supreme Court recently confirmed that a law does not violate the private nondelegation doctrine if it permits a private actor to "function[] subordinately to" a government agency and "subject to its 'authority and surveillance.'" *Consumers' Research*, 606 U.S. at 692 (quoting *Adkins*, 310 U.S. at 399).  The "constitutional inquiry" thus turns on whether the private entity or the government agency ultimately "is in control." *Id.* at 695.  The Authority's role in the Act's enforcement scheme—and, by extension, the role of HIWU acting "on behalf of" HISA, Rule 3010(e)(1)—is subordinate to the FTC in at least three critical respects.

*First*, the Authority may not take any investigatory or disciplinary action that is not "authoriz[ed]" by "uniform procedures and rules" approved by the FTC.  15 U.S.C. § 3054(c)(1)(A), (2); *see also, e.g.*, *id.* §§ 3053(c), 3055(a)(1), 3056(b)(6)-(9), 3057(c)(1), (d).  So any enforcement standards (like any other standards the Authority proposes) have "only the legal (or, indeed, practical) effect the [FTC] decides they should[,]" and the Authority must "[w]ork[] within those rules" to enforce the Act.  *Consumers' Rsch.*, 606 U.S. at 693-694.

*Second*, because the FTC wields plenary rulemaking power to further steer or restrict any of the Authority's enforcement activities, "the Commission is, throughout, the final authority." *Consumers' Rsch.*, 606 U.S. at 694; *see* 15 U.S.C. § 3053(e).  Congress amended HISA to confer on the FTC power to "modify any rules for *any* reasonable reason at all" to "ensure[] that the FTC

17

retains ultimate authority over implementation of the Horseracing Act." *Oklahoma II*, 163 F.4th at 309. Such power necessarily encompasses oversight over enforcement of the Act.

*Third*, "anyone aggrieved by an action of the [Authority] may seek *de novo* review by the [FTC]" (followed by Article III judicial review). *Consumers' Rsch.*, 606 U.S. at 693. The agency may stay any discipline pending its review; "affirm, reverse, modify, set aside, or remand for further proceedings"; and "make any finding or conclusion that, in the judgment of the [FTC], is proper and based on the record." 15 U.S.C. § 3058(b)(3); 16 C.F.R. § 1.148(b). So there is no question that "in the relationship between the two, the Commission dominates." *Consumers' Rsch.*, 606 U.S. at 693.

The FTC's supervision over the Authority and HIWU tracks the longstanding body of case law upholding the parallel Maloney Act's enforcement scheme. *See Oklahoma II*, 163 F.4th at 307. Beyond the SEC's identical rule-approval and rulemaking powers, 15 U.S.C. § 78s(b)-(c), any "final disciplinary sanction" by FINRA (or another self-regulatory organization ("SRO")) is similarly subject to SEC review, *id.* § 78s(d)-(e). That gives the SEC "direct regulatory power over [SRO] rules and practices," such that the agency is not "impoten[t] to affect application of [SRO] rules in particular circumstances." *Gordon v. New York Stock Exch., Inc.*, 422 U.S. 659, 685 (1975). "In case after case, the federal courts have upheld this arrangement, reasoning that the SEC's control over the rules and their enforcement makes the SROs permissible aids and advisors." *Oklahoma II*, 163 F.4th at 307 (collecting cases).

The same conclusion applies under HISA: "[T]he FTC, not the Horseracing Authority, is the agency of ultimate resort that decides how the federal government enforces the Act." *Oklahoma II*, 163 F.4th at 312. Simply put, the Authority and HIWU are "subordinate to the

18

agency" because they "yield[] to FTC supervision and lack[] the final say over rulemaking and enforcement of the law." *Id.* at 301, 307.

      **B.**      **<u>Plaintiff's Challenge Rests On A Caricature Of The Authority-FTC</u>**
                  **<u>Relationship.</u>**

Under *Consumers Research*, "the relevant legal question" for private nondelegation purposes is *whether* the agency "retains decision-making power" under the statute, "not *how often*" the agency exercises that power to "reject[]" or "revise[]" the private entity's actions. 606 U.S. at 692-695 (emphasis added). After all, a claim of an "unconstitutional delegation" from Congress turns on how the power was *delegated* (*i.e.*, given) by Congress in the first place. The problem for Plaintiff is that neither "statutory construction at its best" nor "proper respect for a coordinate branch," *id.* at 691, supports his distorted descriptions of the respective roles over the enforcement activities at issue: Congress simply did not give the Authority and HIWU "unilateral" power and the FTC "no part" to oversee, Pl's Br. 12, 14 (formatting altered).

Plaintiff's objections to the "investigation decision[s]" and "charging decisions" in his case rest on his assertion that "[n]one of the statutes or rules involve the Commission." Pl's Br. 14-15. That is wrong: As Plaintiff acknowledges elsewhere in his brief, all the rules governing the Authority's and HIWU's investigatory and charging activities "had to be approved by the Commission" before HIWU or the Authority took any of the steps at issue. Pl's Br. 30; *see* 15 U.S.C. § 3053 ("Federal Trade Commission oversight"); *id.* § 3054(c). Indeed, the FTC exercised that supervisory authority when it independently approved the Rules detailing every one of the enforcement activities Plaintiff complains about. *See* Pl's Br. 14-16; *see, e.g.*, HISA Rules 3132(a), (c) (testing), 3247(a)(1) (provisional suspension), 7030 (HIWU arbitration); 3223(b) (two-year suspension). Plaintiff does not allege (much less prove) that HIWU or the Authority

acted beyond those "uniform procedures and rules" narrowly "authorizing" their conduct. 15 U.S.C. § 3054(c)(1)(A), (2).

Further, at all times in Plaintiff's case, the FTC has had plenary rulemaking authority under section 3053(e) to "micromanage every particularized decision the Authority [or HIWU] makes in [this] investigation." *Oklahoma II*, 163 F.4th at 312. The FTC thus has had discretion to step in by rule to, for example, "constrain[] the Authority's [or HIWU's] investigation[]," "increas[e] the procedural rights" of Plaintiff, "decrease the penalties for [the] rule violations" Plaintiff faced, or require that HIWU "drop" the investigation if it was determined to be "misguided." *Id*. That the FTC chose not to take those routes in Plaintiff's case is irrelevant to the constitutional inquiry; "the FTC's *capacity* to control the Authority's enforcement activities [has] ensure[d] that the FTC, not the Horseracing Authority, is the agency of ultimate resort that decides how the federal government enforces the Act" here. *Id.* (emphasis added); *see Consumers' Rsch.*, 606 U.S. at 695 (rejecting "rubber-stamp[ing]" argument as not the "relevant legal question" (alteration in original)). That is especially true here, given that the FTC has been a party to this litigation since shortly after charges were noticed against Plaintiff. It is well aware of Plaintiff's case.

Plaintiff's real gripe seems to be that "[t]hese prosecutorial functions" resemble "significant governmental power." Pl's Br. 13, 15 (quoting *Seila L. LLC v. CFPB*, 591 U.S. 197, 224-225 (2020)). Yet the Supreme Court recently solidified that the right question on a private-nondelegation claim "is not whether a private entity performs what looks like an enforcement function," but "whether the private entity is subject to the agency's supervision." *Oklahoma II*, 163 F.4th at 314 (citing *Consumers' Rsch.*, 606 U.S. at 695). "The broad rulemaking authority that Congress delegated to the FTC demonstrates that Congress empowered the agency to supervise the Horseracing Authority." *Id.*

20

Topping off that supervision, "[n]o sanction *** goes into final effect without the FTC's 'say-so.'" *Oklahoma II*, 163 F.4th at 311 (quoting *Consumers' Rsch.*, 606 U.S. at 695). As the Sixth Circuit explained:

> [T]he Authority may investigate a violation of the rules and propose a sanction. But it may not impose a sanction without oversight. Any aggrieved entity may obtain review from an Administrative Law Judge over any sanction proposed by the Horseracing Authority. After that, the FTC has full authority to review the Authority's enforcement actions with fresh eyes. Through this independent review, the FTC may reverse any sanction by the Authority. *** If the Authority tries to implement a sanction before the FTC finally reviews it, the FTC or the ALJ may stay the sanction.

*Id.* (citations omitted). That is exactly what has transpired in Plaintiff's case. The independent, JAMS-appointed Arbitrator imposed sanctions, which were swiftly reviewed *de novo* by an ALJ. JSUMF ¶ 40. When the ALJ decided that a fine was warranted, the Commissioners themselves immediately stepped in *sua sponte* to stay that sanction. *Id.* ¶ 47. And the ALJ and Commissioners have permitted the other equitable sanctions to take effect.

Plaintiff tries to minimize the FTC's review as "after-the-fact." Pl's Br. 13. But *Consumers' Research* underscored that the availability of similar *de novo* review by the agency there, the Federal Communications Commission ("FCC"), meant that "the Commission dominates" in its relationship with the private organization—even though a challenger is necessarily "aggrieved" by the private organization's enforcement decision before the challenger can seek FCC review. 606 U.S. at 693. In that scheme, the private organization exercises "authority to audit" and to otherwise "ensure compliance with [FCC] rules and regulations," 47 C.F.R. §§ 54.705, 54.707(a), and the power to "suspend" participation in the programs, to "assess an administrative remedial collection charge" or other "penalties," and to recover substantial sums for violations of rules, *id.* §§ 54.707(a), 54.713(c). And "the aggrieved" person "must first seek review from the [private organization]" before seeking "review from the [FCC]," *id.* § 54.719(a)-

(b).  Nevertheless, in concluding that the agency "dominates" over the private organization, the Supreme Court made clear that what matters is that the agency ultimately "retains decision-making power."  *Consumers' Rsch.*, 606 U.S. at 692-693.  The ALJ's and Commissioners' orders in this case leave no doubt that the same conclusion applies here with respect to the FTC's "full authority to review the Authority's enforcement actions with fresh eyes."  *Oklahoma II*, 163 F.4th at 311.

In any event, Plaintiff is wrong that the Arbitrator's sanctions "went into effect *before* review by the Commission."  Pl's Br. 14.  The Authority notified the FTC of the suspension before it took effect.  DSMF ¶ 50.  The FTC has demonstrated in this case that it can act quickly, acting *sua sponte* to stay the ALJ's fine within one day of its imposition.  So there can be no doubt that the FTC had the ability to do the same with respect to Plaintiff's suspension if it had wanted to do so—especially when the FTC's authority is viewed in the constitutionally favorable manner that *Consumers' Research* requires.  *See* 606 U.S. at 690 (rejecting argument premised on reading statute "extravagantly, the better to create a constitutional problem").  "Statutes (including regulatory statutes) should be read, if possible, to comport with the Constitution, not to contradict it."  *Id.* at 691.

Finally, Plaintiff's reliance on *Alpine Securities Corp. v. FINRA*, 121 F.4th 1314 (D.C. Cir. 2024), is misplaced.  Pl's Br. 16.  In *Alpine*, the D.C. Circuit preliminarily enjoined a "unique" FINRA expulsion order because FINRA's "expedited-hearing process" would preclude meaningful SEC review of the decision "before it goes into effect and the expelled member's business collapses."  121 F.4th at 1328, 1331.  That decision was "narrow and limited to expedited expulsion proceedings, where the irreversible nature of the underlying sanction prevents review on the merits by the SEC."  *Id.* at 1330.  And it rested on the fact that the SEC "tak[es] weeks or

22

even months before acting" on stay motions, which is "too long for an expelled FINRA member to stay afloat." *Id.* at 1327.

Here, there has been no expedited hearing process. The Authority's order was imposed more than nine months after Plaintiff was charged. The FTC has been aware of this case the whole time, submitting filings in this litigation beginning in November 2024. *See* ECF No. 19. When the FTC wanted to stay a sanction, it took independent action within one business day. JSUMF ¶ 47. And Plaintiff cites to no evidence whatsoever, apart from self-serving allegations, *see* Plaintiff's Statement of Material Facts ¶ 37, that his suspension is a "death penalty," *Alpine*, 121 F.4th at 1340 (Walker, J., concurring in the judgment in part and dissenting in part), or would cause his business to "collapse," *id.* at 1328 (maj. op.) On the contrary, Plaintiff's request for a decision from this Court "prior to July 3, 2026, so that he may participate in the upcoming summer meet at the Saratoga Race Course," ECF No. 82 at 2, refutes any suggestion that his business has effectively closed or soon will. In fact, it is hard to take Plaintiff's comparison to *Alpine* seriously given that he never even challenged his suspension, let alone asked the FTC to stay it, until many months after the Arbitration ended. DSMF ¶¶ 54, 61; JSUMF ¶ 55.

### III.   THE ARBITRATION AND SUBSEQUENT FTC PROCEEDINGS DO NOT RUN AFOUL OF THE SEVENTH AMENDMENT.

Plaintiff's Seventh Amendment challenge also falters out of the gate. First, as part of his registration with the Authority prior to his participation in the race in question, Plaintiff agreed to arbitrate any alleged rule violation subject to FTC review, so he cannot now attack that same process under the Seventh Amendment. Second, Plaintiff faced only equitable remedies in the Arbitration, and the only legal remedy arguably implicated in the administrative proceedings—the fine imposed by the ALJ, which no party had requested—was immediately stayed pending the Commissioners' ongoing review of whether a fine was even properly on the table. That is a purely

legal question; in fact, the FTC proceedings have never involved a material factual dispute. Finally, because the Banned Substance claim concerns a public right, Congress could constitutionally assign its adjudication to a non-Article III tribunal without a jury.

### A.     Plaintiff Waived Any Seventh Amendment Challenge.

"[T]he loss of the right to a jury trial is a necessary and fairly obvious consequence of an agreement to arbitrate." *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1371 (11th Cir. 2005) (quoting *Sydnor v. Conseco Fin. Serv. Corp.*, 252 F.3d 302, 307 (4th Cir. 2001)).  Plaintiff's agreement to arbitrate alleged ADMC violations thus forecloses his claim that he is entitled to jury adjudication.  That places him in a position similar to the countless securities industry participants who have "waived this right" by agreeing to similar "mandatory securities industry arbitration under federally-compelled and SEC-approved procedures" under the parallel SRO-SEC framework.  *Koveleskie v. SBC Cap. Mkts., Inc.*, 167 F.3d 361, 368 (7th Cir. 1999); *see also, e.g., Desiderio v. National Ass'n of Secs. Dealers, Inc.*, 191 F.3d 198, 206-207 (2d Cir. 1999) (rejecting similar Seventh Amendment argument due to agreement to arbitrate).

**i.** Plaintiff does not contest that he registered with the Authority and thus agreed to abide by its rules and procedures, including agreement to its arbitration Rules.  JSUMF ¶¶ 3-8.  On the contrary, he acknowledges that he "manifest[ed]" "an agreement by the trainer to follow HISA rules in exchange for the ability to participate" in the race in question, which included an "agreement to its arbitration rules."  Pl's Br. 21, 34.  In the Eleventh Circuit, "general contract principles govern the enforceability of arbitration agreements."  *Caley*, 428 F.3d at 1372.  So Plaintiff must be held to his agreement unless he can point to "fraud, duress, or some other misconduct or wrongful act recognized by the law of contracts."  *Id.* at 1371.  Plaintiff's attempts to do so fall short.

Plaintiff argues that the Covered Persons Agreement was "procedurally unconscionable" because "the applicable arbitration rules (Rule 7000 series) are not linked in the Covered Persons Agreement." Pl's Br. 35. But Plaintiff affirmatively "Accept[ed]" that he "agree[d] to be subject to and comply with the rules, standards, and procedures developed by HISA and approved by the Federal Trade Commission." JSUMF ¶¶ 6, 8. All of those FTC-approved rules—including the Rule 3000 and 7000 series, which set forth the arbitration process for a Banned Substance violation—are posted on the same website, one click away from the link Covered Persons use to register. DSMF ¶ 42; JSUMF ¶ 3. In any event, as this Court has noted, *see* ECF No. 65 at 13, Plaintiff testified before the Arbitrator that he knew he was obligated to understand the Rules and that he had read the entire list of Rules prior to May 2024, DSMF ¶¶ 46-47. So the fact that the arbitration rules themselves were not linked directly on the same page hardly demonstrates that Plaintiff's participation in the race subject to them was not "knowing." Pl's Br. 34.

Plaintiff also claims the Agreement was "procedurally" and "substantively" unconscionable" because "it is statutorily mandated" and not "mutually binding." Pl's Br. 35. But the "take-it-or-leave-it proposition offering no opportunity to opt out of arbitration" if a covered person wants to participate in such races does not render it unconscionable. *In re Checking Acct. Overdraft Litig.*, 856 F. App'x. 238, 247 (11th Cir. 2021); *see also Koveleskie,* 167 F.3d at 366-368 (rejecting, under Illinois law and the Federal Arbitration Act ("FAA"), argument that requirement to sign arbitration agreement with securities exchange as a condition of employment created an unconscionable contract of adhesion). Moreover, HISA rules make arbitration "the

exclusive remedy in all cases arising under the Rule 3000 Series"—for both the covered person and the Authority.  HISA Rule 7410(a).[3]

Contrary to Plaintiff's assertion that the arbitration agreement is "illusory," the Authority cannot "unilateral[ly]" change the relevant Rule or any other. Pl's Br. 35.  Any change must be submitted to and approved by the FTC. *See* 15 U.S.C. §§ 3053, 3055(g)(3)(B).  In sum, because Plaintiff cannot show "both procedural and substantive unconscionability," *Woebse v. Health Care & Ret. Corp. of Am.*, 977 So. 2d 630, 632 (Fla. Dist. Ct. App. 2008), and he does not even allege "fraud, duress, or some other misconduct or wrongful act," *Caley*, 428 F.3d at 1371, precedent mandates holding him to the Covered Persons Agreement.

**ii.**  Unable to meet the governing test, Plaintiff tries to depart from it.  He contends that his agreement should be evaluated under a "knowing and voluntary" standard he draws from an inapt and unpublished Eleventh Circuit decision, *Bakrac, Inc. v. Villager Franchise Sys., Inc.*, 164 F. App'x 820 (11th Cir. 2006).  That case did not involve an arbitration agreement.  And, as Plaintiff acknowledges, *Caley*—a *precedential* Eleventh Circuit decision—explicitly rejects the "heightened 'knowing and voluntary' standard" in the arbitration context.  *See* 428 F.3d at 1370-1371; Pl's Br. 34.

Plaintiff's only attempt to distinguish *Caley* is his cursory assertion that the FAA does not apply to the Covered Persons Agreement, because that Agreement requires arbitration as the "first step in a congressionally mandated process for adjudicating violations of federal law."  Pl's Br.

---

[3] Plaintiff's argument that the arbitration agreement is not mutually binding appears to flow from a misunderstanding about 15 U.S.C. § 3054(j)(1).  Arbitration under the Rule 3000 and Rule 7000 series is the only mechanism to impose the civil penalties provided under Section 3057 of the Act.  Section 3054(j)(1) allows the Authority to bring a civil action "to enforce any civil sanctions imposed under that section" after an arbitration (and any FTC review) has occurred, if the covered person refuses to comply, *not* to seek those civil penalties in the first place.

34.   But if that fact is relevant to the FAA's coverage, Plaintiff does not explain why.   That omission is especially glaring in light of the Supreme Court's holding that arbitration agreements in the parallel securities context fall within the ambit of the FAA.   *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 n.2 (1991); *see also Caley*, 428 F.3d at 1367 (noting that the FAA "generally provides for the enforceability of 'a contract evidencing a transaction involving commerce'" save for contracts involving "transportation workers" (quoting 9 U.S.C. § 2)). Plaintiff thus provides no persuasive reason to depart from the Eleventh Circuit's applicable "agreement to arbitrate" test.   *Caley*, 428 F.3d at 1372.[4]

**iii.**   Plaintiff is also wrong that the arbitration agreement is an unconstitutional condition burdening his purported "constitutional right to pursue a career in thoroughbred training."   Pl's Br. 31.   Plaintiff appears to contend that the government cannot require a party to submit to arbitration as a condition to register for participation in a regulated activity.   Pl's Br. 31-33.   But an agreement to be subject to the Authority's arbitration procedures (as opposed to the Authority's investigatory activities) flows from the private Authority's rules (approved by the FTC), not from Congress.   *See* 15 U.S.C. § 3054(c), (d)(2) (providing only that registration "shall include an agreement by the covered person to be subject to and comply with the rules, standards, and procedures" concerning Authority's "investigatory powers").   In any event, the Supreme Court has explained that Congress

---

[4] *Caley* strongly suggests that Plaintiff's assent to the Covered Persons Agreement would likely pass muster even under a heightened "knowing and voluntary" standard.   *See* 428 F.3d at 1372 n.13 (citing *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 506 (6th Cir. 2004), for the proposition that "entering into an arbitration agreement evidences a knowing and voluntary waiver of trial rights because the waiver of the right to a jury trial is an obvious and necessary consequence of entering into an arbitration agreement").   Indeed, as noted, Plaintiff's counsel conceded that Plaintiff had read all the Rules prior to his participation in the race which he had agreed would be subject to them, foreclosing any serious contention that his agreement was not knowing and voluntary.   DSMF ¶¶ 46-47.

"has the power to condition issuance of registrations or licenses on compliance with agency procedures." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 589 (1985).

In a circumstance even closer to home, the Seventh Circuit confronted and rejected a nearly identical argument in the parallel securities registration context.  In *Koveleskie*, a plaintiff was required to register with several SROs as a condition of her employment; to register with those SROs, she had to agree to mandatory arbitration of various employment claims.  167 F.3d at 363. Because that arbitration requirement was approved by the SEC as part of its oversight of the SROs, the plaintiff argued that "mandatory securities industry arbitration under federally-compelled and SEC-approved procedures" violated her rights under the Seventh Amendment as an unconstitutional condition.  *Id.* at 368.  The Seventh Circuit disagreed, explaining that the plaintiff waived her right to an Article III forum by agreeing to arbitrate upon registering with each SRO. The arbitration agreement thus did not violate her Seventh Amendment rights, because "the law is clear that there is no constitutional right to a jury trial outside of an Article III forum."  *Id.*  The Eleventh Circuit takes the same view of the relationship between an arbitration agreement and the Seventh Amendment, so the same result should follow here.  *See Caley*, 428 F.3d at 1371 ("[T]he Seventh Amendment does not confer the right to a trial, but only the right to have a jury hear the case once it is determined that the litigation should proceed before a court.  If the claims are properly before an arbitral forum pursuant to an arbitration agreement, the jury trial right vanishes." (emphasis omitted) (quoting *American Heritage Life Ins. Co. v. Orr*, 294 F.3d 702, 711 (5th Cir. 2002))).

Plaintiff attempts to distinguish *Koveleskie* only by noting that "[t]he SEC did not require registration with a particular exchange that had mandatory arbitration agreements," whereas here, the Act itself requires covered persons to register with the Authority and the Authority's rules

28

require submission to HIWU's arbitration process.  Pl's Br. 32-33.  But similar to *Koveleskie*, here the Act "required registration with [the Authority], not entry into an arbitration agreement."  167 F.3d at 368.  And "[s]imply because the SEC [or FTC] approved the arbitration [rules] \*\*\* is not enough" to conclude the agency itself required the Authority to mandate arbitration in the first instance.  *Desiderio*, 191 F.3d at 207.  Regardless, the distinction Plaintiff tries to draw—speaking to whether a state actor was adequately involved in inducing Plaintiff's waiver to trigger the unconstitutional conditions doctrine—is beside the point.  The Seventh Circuit held that, "[e]ven if one were to assume state action," requiring an agreement to arbitrate still did not run afoul of the unconstitutional conditions doctrine.  *Koveleskie*, 167 F.3d at 368.  So too here.

### B.     The Seventh Amendment Does Not Apply To Plaintiff's Proceedings Before The Arbitrator Or The FTC.

Brushing past his agreement to arbitrate, Plaintiff contends that the Seventh Amendment applies to the ADMC adjudication at the Arbitration and Commission-review phases.  He is wrong twice over.

#### 1.     The Seventh Amendment was not implicated by the Arbitration.

Plaintiff concedes, as he has all along, that the "imposition of the fine" is the only relevant remedy that could possibly trigger the Seventh Amendment.  Pl's Br. 18; *see* ECF No. 65, at 18-19.  The other sanctions involved in this case—suspension, disgorgement, and public disclosure—are equitable, rather than legal, and thus do not implicate the Seventh Amendment.  *See Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1358-1359 (11th Cir. 2019) (action seeking only "equitable" relief, including "injunction," "accounting," and "disgorgement" of profits, "does not carry with it a right to a jury trial").  Plaintiff does not argue otherwise.

29

It is undisputed that neither HIWU nor the Authority sought a fine in the Arbitration, and the Arbitrator did not impose one. JSUMF ¶ 29. So the Arbitration did not "implicate" the Seventh Amendment. *SEC v. Jarkesy*, 603 U.S. 109, 121-123 (2024).[5]

        2.     *The Seventh Amendment has not been implicated by the FTC's review.*

Nor is Plaintiff's Seventh Amendment right to a jury trial implicated by the FTC's review of the Arbitration—either before the ALJ or the Commissioners.

Though the ALJ decided a fine should be imposed, the FTC acted *sua sponte* to immediately stay that portion of the ALJ's decision before it ever took practical effect. JSUMF ¶ 47. If the FTC decides—as the Authority has urged—that the ALJ lacked the authority to impose a fine in the first instance, then no legal remedy was ever properly on the table before the agency. As a result, there could be no Seventh Amendment violation.

Regardless, Plaintiff had no Seventh Amendment right to a jury trial during the administrative proceedings for an independent reason: By the time Plaintiff came before the FTC, he did not dispute any issues of fact or even his own liability. Rather, he raised exclusively legal arguments concerning the appropriate penalty for his ADMC violation. DSMF ¶¶ 51-56. Plaintiff

---

[5] Because a fine was not on the table, this Court need not decide whether the Arbitration "was state action." Pl's Br. 29. In any event, "every court to have considered this state actor argument" with respect to the parallel eight-decade-long relationship between FINRA (or its predecessor) and the SEC "has rejected it." *Kim v. FINRA*, 698 F. Supp. 3d 147, 161 (D.D.C. 2023) (collecting cases). FINRA is subject to the same "extensive and detailed" oversight by the SEC that the Plaintiff cites here, Pl's Br. 30, but courts have found, "repeatedly, that [FINRA or its predecessor] is not a government functionary." *D.L. Cromwell Invs., Inc. v. NASD Regul., Inc.*, 279 F.3d 155, 161-162 (2d Cir. 2002); *see also, e.g., Desiderio*, 191 F.3d at 201, 206-207 ("requisite state action is absent," even if "the SEC approved the arbitration" mandate and exercises "close supervision" over its "application or enforcement."); *Jones v. SEC*, 115 F.3d 1173, 1182 (4th Cir. 1997) ("While its self-regulating powers are supervised by the SEC, which is essentially given a veto power over [FINRA's predecessor's] disciplinary action, that review power does not convert [FINRA's predecessor's] interest to the same interest as that of the regulating agency.").

did not appeal from the ALJ's decision, and instead asked the Commission to clarify the scope of its own *sua sponte* review because Plaintiff had not "identified any error for appeal." JSUMF ¶ 48; DSMF ¶ 58. And when, months later, he belatedly attempted to raise factual issues related to his liability for the first time before the agency (likely because his new counsel recognized that his failure to do so previously doomed his Seventh Amendment claim), the Commission held as a legal matter that he had waived the opportunity. DSMF ¶¶ 63-64.

"No one is entitled in a civil case to trial by jury, unless and except so far as there are issues of fact to be determined." *In re Peterson*, 253 U.S. 300, 310 (1920); *see also Itel Cap. Corp. v. Cups Coal Co.*, 707 F.2d 1253, 1261 (11th Cir. 1983) ("[W]here no issue of fact remains, summary judgment decides only questions of law and does not deprive the losing party of its jury trial right."); *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 759 (7th Cir. 2006) ("The Seventh Amendment does not entitle parties to a jury trial when there are no factual issues for a jury to resolve."). Further, even where a jury is necessary at the liability phase of a civil proceeding, the Seventh Amendment does not require one when all that is left to determine is the appropriate penalty—which is the only issue ever subject to dispute in the FTC proceedings. *See Tull v. United States*, 481 U.S. 412, 426-427 (1987) ("We therefore hold that a determination of a civil penalty is not an essential function of a jury trial, and that the Seventh Amendment does not require a jury trial for that purpose in a civil action."). So from the start, none of the issues before the FTC have been the type constitutionally entrusted to a jury.

## C.     The Banned Substance Claim Concerns A Public Right.

Plaintiff's claim would fail even if the Seventh Amendment had been triggered. Cases "concerning what [courts] have called 'public rights'" (as opposed to "private rights") can be determined by "an agency without a jury, consistent with the Seventh Amendment." *Jarkesy*, 603

31

U.S. at 127-128.  Whether a particular claim qualifies depends on whether it sounds in common law and on "historical practice."  *Id.* at 128-130.  Both factors underscore that the Banned Substance claim against Plaintiff fits comfortably within the category of public rights.

          1.     *The Banned Substance claim is based on technical standards unknown to the common law.*

The Third Circuit has helpfully addressed the public rights doctrine in two post-*Jarkesy* cases, *Axalta Coating Systems LLC v. Federal Aviation Administration*, 144 F.4th 467 (3d Cir. 2025) and *Sun Valley Orchards, LLC v. United States Dep't of Labor*, 148 F.4th 121 (3d Cir. 2025).  In *Axalta*, the Third Circuit held that the public rights doctrine encompassed an agency action seeking civil penalties for violations of the Hazardous Materials Regulations ("HMR").  The HMR "consist of technical prescriptions for engaging in *** regulated activity," including the types of adhesion required to secure packaging materials and pressure measurements that packages shipped on airplanes must be able to withstand.  *Axalta*, 144 F.4th at 476-477.  Because "[t]echnical standards such as these are unknown to the common law," the court of appeals held that the "right to enforce the HMR by obtaining a civil monetary penalty against a violator is a public right that Congress may assign to the executive branch for adjudication without offense to the Seventh Amendment."  *Id.* at 477 (internal quotation marks omitted).

In contrast, the Third Circuit reached the opposite conclusion in *Sun Valley*, where it addressed an enforcement action for civil penalties for an employer's violation of conditions set forth in a "job order" that "functions as a 'work contract.'"  148 F.4th at 128.  The court of appeals concluded that the action at issue did not concern a public right because "[i]t is the violation of the terms of that work contract, rather than the regulations that shape it, that supports [the agency's] enforcement actions."  *Id.*  Accordingly, the enforcement action was "framed *** in contractual terms," and the ALJ's decision too "sounded partially in contract."  *Id.* at 129.  It was "[t]his

32

contractual framing [that] distinguishe[d] the enforcement action [in *Sun Valley*] from the one \*\*\*
in *Axalta*[.]"  *Id.* at 128 n.4.

Plaintiff accepts that these two cases properly exemplify each side of the public-rights
inquiry whether a claim sounds in common law, and so he recognizes that the "distinction"
between them provides a helpful framework here.  Pl's Br. 27.  But he draws the wrong conclusion.
The Banned Substance claim is much more similar to the technical standards in *Axalta* than the
breach-of-contract analogue in *Sun Valley*.  Like the statute in *Axalta*, the Act dictates that the
Authority must issue by rule "uniform standards for \*\*\* the administration of medication to
covered horses by covered persons; \*\*\* laboratory testing accreditation and protocols; and \*\*\* a
list of permitted and prohibited medications, substances, and methods, including allowable limits
of permitted medications, substances, and methods."  15 U.S.C. § 3055(c)(1); *see* 144 F.4th at 476
(HMR are promulgated "pursuant to 49 U.S.C. § 5103(b), which provides, in part, that the
'Secretary [of Transportation] shall prescribe regulations for the safe transportation, including
security, of hazardous material in intrastate, interstate, and foreign commerce.'").  And like the
HMR, the ADMC Rules consist of technical tables detailing the types of substances prohibited,
the expected detection time between treatment and testing, and the threshold volume of a substance
in a horse's sample necessary to establish a violation.  *See* App. 1 to HISA Rule Series 4000.
These standards are "unknown to the common law," *Jarkesy*, 603 U.S. at 137, such that no amount
of looking toward common-law concepts can establish "the circumstances under which a person
'violates' the [Rules]."  *Axalta*, 144 F.4th at 477.

Meanwhile, the Banned Substance claim looks nothing like the breach-of-contract
analogue in *Sun Valley*.  Plaintiff's violation is based entirely on his violation of the ADMC Rules,
rather than his breach of the Covered Persons Agreement.  Thus "[t]he heart of [Plaintiff's]

violation is the fact that the horse was [endangered]; any potential breach of contract associated with that is collateral to the harm that the [Act] seeks to address." *Manis v. USDA*, 796 F. Supp. 3d 178, 206 (M.D.N.C. 2025) (rejecting Seventh Amendment challenge to Horse Protection Act enforcement proceeding).

Nor does the Banned Substance charge "target the same basic conduct," *Jarkesy*, 603 U.S. at 134, as the other common-law analogues Plaintiff suggests. For example, while common-law fraud targets "misrepresenting or concealing material facts," *id*. at 125, the Authority's anti-doping Rules are agnostic as to whether the use of a Banned Substance is concealed or not. *See* HISA Rule 3212. That also defeats Plaintiff's fallback analogy to fraudulent conveyance. *See* Pl's Br. 20 ("In a fraudulent-conveyance claim, fraud is not committed through a false representation but 'in the acts of concealment and hindrance.'" (quoting *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 362 (2016))). And the Banned Substance claim certainly does not "mirror[]" the "public welfare" offenses Plaintiff cursorily references. Pl's. Br. 22; *see United States v. Cordoba-Hincapie*, 825 F. Supp. 485. 496 (E.D.N.Y. 1993) (discussing "minor violations of the liquor laws, the pure food laws, the anti-narcotics laws, motor vehicle and traffic regulations, sanitary, building and factory laws and the like" (quoting Francis Bowes Sayre, *Public Welfare Offenses*, 33 COLUM. L. REV. 55, 78 (1933))).

Plaintiff's analogy to common-law negligence actions is similarly flawed. Because a Responsible Person is "strictly liable for any Banned Substance *** found to be present in a Sample collected from his or her Covered Horse[]," "it is *not necessary* to demonstrate intent, Fault, negligence, or knowing Use *** in order to establish *** a Rule 3212 Anti-Doping Rule Violation." HISA Rule 3212(a) (emphasis added). A Responsible Person's demonstration of "No Fault or Negligence" (HISA Rule 3224) or "No Significant Fault or Negligence" (HISA Rule

3225) is relevant only to mitigating or eliminating the consequences of a violation (*i.e.*, the penalty; not the liability).  This is far removed from the action at issue in *AT&T, Inc. v. FCC*, 149 F.4th 491 (5th Cir. 2025), *cert. granted* 2026 WL 73092 (U.S. Jan. 9, 2026) (No. 25-406), which was predicated on a violation of a regulation that dictated "[Carriers] must take reasonable measures to discover and protect against attempts to gain unauthorized access to [customers' personal information]." *Id.* at 498 (quoting 47 C.F.R. § 64.2010(a)) (first alteration in original).  The agency there "decided *whether AT&T violated* [the regulation] by repeatedly asking whether the company had acted reasonably." *Id*. (emphasis added).  Not so here.  *Cf. Axalta*, 144 F.4th at 477 (rejecting similar negligence analogy predicated on the HMR's use of "knowingly").

Finally, each of common-law fraud, breach of contract, negligence, and tortious interference also requires proof of some form of injury to a third party, *see, e.g.*, *Manis*, 796 F. Supp. 3d at 206 (fraud and breach of contract); RESTATEMENT (THIRD) OF TORTS: LIAB. FOR PHYSICAL AND EMOTIONAL HARM § 6 (2010) (negligence); RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECONOMIC HARM § 18 (2020) (tortious interference).  A Banned Substance claim does not.  *See* HISA Rule 3212.

In sum, the ADMC Program Rules do not "employ the same terms of art[] and operate pursuant to similar legal principles" as Plaintiff's proffered analogues, nor are they "interpreted in light of[] their [proposed] common law counterparts." *Jarkesy,* 603 U.S. at 134, 138.  Instead, the Banned Substance claim is based on "technical prescriptions" totally "unknown to the common law." *Axalta*, 144 F.4th at 476-477 (quoting *Jarkesy*, 603 U.S. at 137).  "The 'substance of the suit' is to regulate controlled substances" in furtherance of the public's interests in horses' health, safety, and welfare.  *Simfa Rose Pharma. Specialty, Inc. v. Bondi*, No. 0:23-cv-61531, 2025 WL 2717151, at *8 (S.D. Fla. Sep. 24, 2025) (Liebowitz, J.) (holding that a claim regulating controlled

35

substances "in the interests of public health *** may be adjudicated in a non-Article III forum"); *see* HISA Rule 3111(a)(1)(iii) ("The Prohibited List identifies Prohibited Substances and Prohibited Methods that are [] prohibited at all times (Banned Substances and Banned Methods) on the basis of the Agency's determination that medical, veterinary, or other scientific evidence or experience supports their *** detrimental impact on horse welfare."). That fits within the public rights exception to the Seventh Amendment.

> 2.    *Adjudication of anti-doping rules has historically taken place outside courts of law.*

Even if these Banned Substances charges "were presented in such form that the judicial power was capable of acting on them," "no involvement by an Article III court in the initial adjudication is necessary" because they "historically could have been determined exclusively by the executive and legislative branches." *Jarkesy*, 603 U.S. at 128 (internal quotation marks and alterations omitted). In fact, they have been so determined.

For the first 100 years of this country's existence, horseracing was functionally "unregulated," with no evidence of any anti-doping enforcement in common-law courts. ROBERT L. HELERINGER, EQUINE REGULATORY LAW 43-44 (2012). By the latter part of the nineteenth century, a private organization known as the Jockey Club "wrote the rules of racing" and "enforced *** and interpreted them as a court of last appeal," without any resort to jury trials. *Id.* at 44. When those efforts soon proved lacking, states started to create their own racing commissions to regulate the sport. *E.g., id.* at 48, 76. Those commissions, in turn, enforced horseracing regulations (subject to monetary penalties) through administrative processes that provided no right to a jury trial. *See, e.g.*, FLA. STAT. § 550.0251(10) (2024) (Florida Gaming Control Commission may impose fines and suspensions for horseracing violations); FLA. ADMIN. CODE R.75-3.001(2) (horseracing violations adjudicated by board of stewards and Division of Pari-Mutuel Wagering

36

judge, not a jury); LA. STAT. ANN. §§ 4:224, 49:955, 49:964(F) (2022) ("commission's hearings, practice and procedure, and rule making procedure are as provided in the [Louisiana] Administrative Procedure Act," which does not guarantee jury trial); W. VA. CODE §§ 19-23-14(b), 19-23-16(f) ("civil penalties" are "imposed by the [commission's] stewards, or the commission," and hearings are "conducted by a quorum of the Racing Commission or by a hearing examiner appointed by the Racing Commission").

Against that long history of legislative and executive adjudication of similar ADMC-type claims, Plaintiff has not pointed to a single case where such a claim was adjudicated in the first instance in an Article III (or any common law) court.

### 3. *Plaintiff's counterarguments are not persuasive.*

Plaintiff's attempts to resist the conclusion that the Banned Substance claim concerns a public right do not hold up to scrutiny.

*First*, Plaintiff tries to cabin the public rights exception to "six categories": revenue collection, immigration, tariffs, public lands, tribal relations, and public benefits. Pl's Br. 23-24. But the doctrine is not so limited. *See, e.g., Axalta*, 144 F.4th at 475-477 (applying doctrine to public right outside the categories Plaintiff enumerates); *Simfa Rose Pharmaceutical Specialty*, 2025 WL 2717151 at *8 (explaining that "the Supreme Court recognized long ago that matters involving public health constitute a 'public right'").

*Second*, Plaintiff urges that "an exercise of the interstate-commerce power *cannot* be a justification to invoke the public rights exception," Pl's Br. 24-25, relying on *Jarkesy*, 603 U.S. at 129 n.1. Read in context, the language to which Plaintiff cites in *Jarkesy* stands only for the more limited proposition that the public rights doctrine does not extend to *all* exercises of the interstate commerce power. *See* 603 U.S. at 129 n.1. And the Supreme Court has previously rejected the overbroad rule Plaintiff now sets forth. *See Atlas Roofing Co. v. Occupational Safety & Health*

37

*Review Commission,* 430 U.S. 442, 456-457 (1977); *see also Axalta*, 144 F.4th at 475 (observing that the Supreme Court in *Jarkesy* "distinguished, but did not overrule, its holding in *Atlas Roofing*").

*Third*, Plaintiff points to a purported history of regulating horseracing through contract suits, Pl's Br. 22, and regulating "cheating during gambling games" through suits for money damages, Pl's Br. 20.  But Plaintiff's breach-of-contract example is inapt for the reasons already given, and his stretch to rely on suits in gambling contexts wholly unrelated to horse racing (much less to Banned Substance rules meant to protect horses) only underscores that the historical record favors the Authority's position.

*Fourth*, Plaintiff's attempts to distinguish *Axalta* boil down to his assertion that the Banned Substance claim is analogous to common-law actions.  As explained above, most of Plaintiff's proffered analogues simply do not fit.  *See supra* Section III.C.i.  To the extent Plaintiff relies on *Tull* to suggest that the Banned Substance claim cannot concern a public right because "a claim for punitive civil monetary penalties is itself a common law cause of action," Pl's Br. 18 (arguing the Banned Substance claim "is a common law action in debt"), he goes too far.  As the Third Circuit explained, "the public rights doctrine was not at issue" in *Tull*, which instead concerned "the 'threshold' question of whether a civil penalty 'implicates the Seventh Amendment.'" *Axalta*, 144 F.4th at 475 n.2 (quoting *Jarkesy*, 603 U.S. at 120).  Indeed, if Plaintiff were correct, the entire analysis of common-law fraud in *Jarkesy* would have been unnecessary.

Because Plaintiff faces only equitable remedies on a Banned Substances charge unknown to the common law and historically adjudicated outside common-law courts, where the FTC's

38

resolution of that charge does not turn on any disputed facts, his enforcement action does not violate the Seventh Amendment.[6]

## IV.   THIS COURT NEED NOT STEP IN TO ISSUE PERMANENT INJUNCTIVE RELIEF.

Plaintiff's request for a permanent injunction, albeit "limited to just [his] adjudication," Pl's Br. 38, ultimately lays bare the basic problems with his suit.  His request is premised in significant part on the "irreparable injury" that would flow from "ongoing subjection to the Commission Review."  Pl's Br. 36.  But it is difficult to square that assertion with the fact that such review (1) has stayed the only sanction that Plaintiff has ever claimed implicates the Seventh Amendment (and is determining whether the ALJ had authority to issue that sanction in the first place), and (2) provides the oversight required under the private nondelegation doctrine.  His failure to seek stay relief from the ALJ, while only belatedly moving for such relief from the Commission directly, also undermines his request that this Court prematurely issue such relief now.

## CONCLUSION

The Authority respectfully requests that the Court deny Plaintiff's expedited motion for summary judgment and grant the Authority's cross-motion for summary judgment.

---

[6] Insofar as Plaintiff also raises a facial Seventh Amendment challenge to the adjudication of Banned Substance claims without a jury, Pl's Br. 10 n. 1, that claim fails because Plaintiff's own case demonstrates a "constitutional application" of the arbitration Rules sufficient to "defeat a facial challenge." *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1313 (11th Cir. 2009). But even if this Court disagrees, there are myriad circumstances in which the adjudication of a Banned Substance charge without a jury is obviously constitutional—most notably, a situation in which only equitable relief is ever sought or imposed. *See Hard Candy*, 921 F.3d at 1352 (holding that a plaintiff is not "entitled to a jury trial *** if the claims sound[] in equity"). Likewise, the FTC's stay order in this case shows how the agency's dual levels of review "by themselves insulate the Act from a successful facial challenge" under the private nondelegation doctrine. *Oklahoma II*, 163 F.4th at 311.

Respectfully submitted,

s/ *Johnny P. ElHachem*

Johnny P. ElHachem (FL Bar No.: 1015837)

Pratik A. Shah
   *Admitted Pro Hac Vice*
Lide E. Paterno
   *Admitted Pro Hac Vice*
AKIN GUMP STRAUSS
   HAUER & FELD LLP
2001 K Street, NW
Washington, DC 20006
Phone: 202-887-4000
Fax: 202-887-4288

HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Phone: (305) 789-7583
Fax: (305) 789-7799
Email: johnny.elhachem@hklaw.com

John C. Roach
   *Admitted Pro Hac Vice*
RANSDELL ROACH & ROYSE, PLLC
176 Pasadena Drive, Building One
Lexington, KY 40503
Phone:  859-854-3672
Fax:  859-276-4500

*Counsel to Horseracing Integrity and Safety Authority, Inc.*

Dated:  March 23, 2026

40