**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

Case No. 0:24-cv-61939-LEIBOWITZ

PHILIP SERPE,

      Plaintiff,

v.

FEDERAL TRADE COMMISSION; AND
HORSERACING INTEGRITY AND
SAFETY AUTHORITY, INC.,

      Defendants.

_____/

**<u>DEFENDANT FEDERAL TRADE COMMISSION'S OPPOSITION TO
PLAINTIFF'S EXPEDITED MOTION FOR SUMMARY JUDGMENT AND
MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................................1

BACKGROUND .........................................................................................................................................1

ARGUMENT...............................................................................................................................................2

I.      Plaintiff's administrative proceedings comport with private nondelegation principles. .............2

        A.     Plaintiff's proceedings are constitutional.............................................................................2

        B.     Plaintiff's arguments fail to show that his adjudication violates the private
              nondelegation doctrine. .........................................................................................................7

II.     Plaintiff cannot prevail on his Seventh Amendment claim...........................................................10

        A.     The Court should not reach the merits of Plaintiff's Seventh Amendment
              claim........................................................................................................................................10

        B.     Plaintiff's adjudication comports with the Seventh Amendment...............................14

        C.     The public rights doctrine also applies...........................................................................22

        D.     Plaintiffs' state action arguments have been overcome by events. .............................24

        E.     Serpe may have waived his Seventh Amendment jury trial...........................................24

III.    Plaintiff is not entitled to permanent injunctive relief. .................................................................25

        A.     Plaintiff has not established irreparable harm. ...............................................................26

        B.     An injunction would be contrary to the public interest................................................27

CONCLUSION..........................................................................................................................................27

## TABLE OF AUTHORITIES

**CASES**

*Alabama v. U.S. Army Corps of Eng'rs*,
424 F.3d 1117 (11th Cir. 2005) ................................................................................. 26, 27

*Alexander v. Trump*,
753 F. App'x 201 (5th Cir. 2018) ................................................................................. 12

*Alpine Securities Corp. v. FINRA*,
121 F.4th 1314 (D.C. Cir. 2024) ................................................................................. 9

*Arnaiz v. Warden*,
594 F.3d 1326 (11th Cir. 2010) ................................................................................. 24

*AT&T, Inc. v. FCC*,
149 F.4th 491 (5th Cir. 2025), *cert. granted sub nom.*,
*FCC v. ATT&T, Inc.*, --- S. Ct. ---, 2026 WL 73092 (Jan. 9, 2026) ................................. 16

*Atlas Roofing Co. v. Occupational Safety & Health Review Commission*,
430 U.S. 442 (1977) ................................................................................. 22

*Axalta Coating Sys. LLC v. FAA*,
144 F.4th 467 (3d Cir. 2025) ................................................................................. 23

*Axon Enterprises, Inc. v. FTC*,
598 U.S. 175 (2023) ................................................................................. 13

*Bakrac, Inc. v. Villager Franchise Sys., Inc.*,
164 Fed. Appx. 820 (11th Cir. 2006) ................................................................................. 24

*Beck v. Lazard Freres & Co., LLC*,
175 F.3d 913 (11th Cir. 1999) ................................................................................. 20

*Bennett v. Spear*,
520 U.S. 154 (1997) ................................................................................. 11

*BFP v. Res. Trust Corp.*,
511 U.S. 531 (1994) ................................................................................. 19

*Caley v. Gulfstream Aerospace Corp.*,
428 F.3d 1359 (11th Cir. 2005) ................................................................................. 24

*Carr v. Saul*,
593 U.S. 83 (2021) ................................................................................. 10

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936) ................................................................................. 3

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*,
526 U.S. 687 (1991) ................................................................................. 15, 16

*Colo. River Indian Tribes v. Marsh*,
   605 F. Supp. 1425 (C.D. Cal. 1985) ........................................................................................ 27

*Cornish v. Dudas*,
   540 F. Supp. 2d 61 (D.D.C. 2008) ........................................................................................... 27

*Crowell v. Benson*,
   285 U.S. 22 (1932) ..................................................................................................................... 17

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ................................................................................................................... 26

*Darby v. Cisneros*,
   509 U.S. 137 (1993) ................................................................................................................... 10

*Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.*,
   797 F.3d 1248 (11th Cir. 2015) ................................................................................................ 21

*Egbert v. Boule*,
   596 U.S. 482 (2022) ................................................................................................................... 12

*Eubank v. Richmond*,
   226 U.S. 137 (1912) ..................................................................................................................... 2

*FCC v. Consumers' Rsch.*,
   606 U.S. 656 (2025) ............................................................................................................ *passim*

*First Jersey Sec., Inc. v. Bergen*,
   605 F.2d 690 (3d Cir. 1979) ........................................................................................................ 7

*Fla. Agency for Health Care Admin. v. Admin. for Ctrs. for Medicare & Medicaid Servs.*,
   161 F.4th 765 (11th Cir. 2025) ................................................................................................ 10

*Florida v. Dep't of Health & Human Servs.*,
   739 F. Supp. 3d 1091 (M.D. Fla. 2024) ................................................................................. 14

*Free Enter. Fund v. Pub. Accounting and Oversight Bd.*,
   561 U.S. 477 (2010) ................................................................................................................... 10

*Gill v. Whitford*,
   585 U.S. 48 (2018) ..................................................................................................................... 26

*Godelia v. Doe 1*,
   881 F.3d 1309 (11th Cir. 2018) ................................................................................................ 21

*Granfinanciera, S.A. v. Nordberg*,
   492 U.S. 33 (1989) ............................................................................................................... 15, 17

*Grise v. State*,
   37 Ark. 456 (1881) ..................................................................................................................... 17

*Harris Cty. v. MERSCORP Inc.*,
 791 F.3d 545 (5th Cir. 2015) ............................................................ 12

*Helvering v. Mitchell*,
 303 U.S. 391 (1938) ............................................................ 18

*Huff and Puffers, LLC v. FDA*,
 2025 WL 1092696 (C.D. Cal. Feb. 27, 2025) ............................................................ 14

*Ibarra v. Swacina*,
 628 F.3d 1269 (11th Cir. 2010) ............................................................ 10

*Irvine v. Rare Feline Breeding Ctr., Inc.*,
 685 N.E. 2d 120 (1997) ............................................................ 21

*Johnson & Co. v. SEC*,
 198 F.2d 690 (2d Cir. 1952) ............................................................ 7

*Kadylak v. Royal Caribbean Cruise, Ltd.*,
 167 F. Supp. 3d 1301 (S.D. Fla. 2016) ............................................................ 20

*Kaimowitz v. Orlando, Fla.*,
 122 F.3d 41 (11th Cir. 1997) ............................................................ 27

*Ketcham v. U.S. Nat'l Park Serv.*,
 2016 WL 4268346 (D. Wyo. Mar. 29, 2016) ............................................................ 12, 13

*Koster & Wythe v. Massey*,
 293 F.2d 922 (9th Cir. 1961) ............................................................ 21

*Leachco v. Consumer Prod. Safety Comm'n*,
 103 F.4th 748 (10th Cir. 2024), *cert. denied*, 145 S. Ct. 1047 (2025) (Mem.) ............................................................ 26

*Lebron v. Fla. Dep't of Children & Families*,
 710 F.3d 1202 (11th Cir. 2013) ............................................................ 25

*Liu v. SEC*,
 591 U.S. 71 (2020) ............................................................ 15

*Lukezic v. FINRA*,
 2025 WL 2305859 (D.D.C. Aug. 10, 2025) ............................................................ 26

*Manis v. U.S. Dep't of Agric.*,
 796 F. Supp. 3d 178 (M.D.N.C. 2025), *appeal filed*,
 No. 25-2001 (4th Cir. Aug. 28, 2025) ............................................................ 19, 23

*Maryland v. King*,
 567 U.S. 1301 (2012) ............................................................ 27

*Millenia Hous. Mgmt. v. U.S. Dep't of Hous. & Urban Dev.*,
735 F. Supp. 3d. 1051 (N.D. Ohio 2025) ............................................................................ 14

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ............................................................................................................ 25

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .............................................................................................................. 2

*Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*,
107 F.4th 415 (5th Cir. 2024) .............................................................................................. 6

*Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*,
414 U.S. 453 (1974) ............................................................................................................ 12

*NCRNC, LLC v. Kennedy*,
786 F. Supp. 3d 496 ........................................................................................................... 14

*Nexstar Media, Inc. Grp. v. NLRB*,
746 F. Supp. 3d 464 (N.D. Ohio 2024) ............................................................................. 14

*Nken v. Holder*,
556 U.S. 418 (2009) ............................................................................................................ 27

*Northwest Airlines, Inc. v. Minnesota*,
322 U.S. 292 (1944) ............................................................................................................ 23

*Oceanic Steam Navigation Co. v. Stranahan*,
214 U.S. 320 (1909) ............................................................................................................ 18

*Okeelanta Corp. v. U.S. Army Corps of Eng'rs*,
132 F.4th 1320 (11th Cir. 2025) .................................................................................... 11, 12

*Oklahoma v. United States*,
62 F.4th 221 (6th Cir. 2023), *vacated* 145 S. Ct. 2836 (2025) (Mem.) ............................ 6, 7

*Oklahoma v. United States*,
163 F.4th 294 (6th Cir. 2025) ................................................................................ 4, 5, 6, 7, 8

*People v. Brunell*,
48 How. Pr. 435 (N.Y. Gen. Sess. 1874) ........................................................................... 17

*SEC v. Jarkesy*,
603 U.S. 109 (2024) ..................................................................................................... *passim*

*Serpe v. FTC*,
2025 WL 2840499 (S.D. Fla. May 29, 2025) ..................................................................... 26

*Serpe v. FTC*,
2025 WL 4098300 (S.D. Fla. Oct. 30, 2025) ..................................................................... 26

*Sheetz v. Cty. of El Dorado,*
　601 U.S. 267 (2024) ........................................................................................................ 25

*Siegel v. LePore,*
　234 F.3d 1163 (11th Cir. 2000) ...................................................................................... 26

*Sorrell v. SEC,*
　679 F.2d 1323 (9th Cir. 1982) .......................................................................................... 7

*Soul Quest Church of Mother Earth, Inc. v. Att'y Gen., U.S.,*
　92 F.4th 953 (11th Cir. 2023) ......................................................................................... 12

*Stieglitz v. IronMountain Sols., Inc.,*
　2024 WL 6895827 (N.D. Ala. Nov. 12, 2024) ................................................................ 12

*Storey v. Rubin,*
　976 F. Supp. 1478 (N.D. Ga. 1997) ............................................................................... 12

*Sunshine Anthracite Coal Co. v. Adkins,*
　310 U.S. 381 (1940) ..................................................................................................... 3, 8

*Terral v. Burke Constr. Co.,*
　257 U.S. 529 (1922) ....................................................................................................... 25

*Thomas Cusack Co. v. City of Chicago,*
　242 U.S. 526 (1917) ......................................................................................................... 2

*Todd & Co. v. SEC,*
　557 F.2d 1008 (3d Cir. 1977) ........................................................................................... 7

*Trump v. New York,*
　592 U.S. 125 (2020) ....................................................................................................... 14

*United States v. Cordoba-Hincapie,*
　825 F. Supp. 485 (E.D.N.Y. 1993) ................................................................................ 22

*United States v. Winstar Corp.,*
　518 U.S. 839 (1996) ....................................................................................................... 20

*Vape Cent. Grp. v. FDA,*
　2025 WL 637416 (D.D.C. Feb. 27, 2025) ..................................................................... 14

*VHS Acquisition Subsidiary No. 7 v. NLRB,*
　808 F. Supp. 3d 1 (D.D.C. 2024) ................................................................................... 14

*Waffle House, Inc. v. NLRB,*
　2025 WL 602744 (D.S.C. Feb. 10, 2025) ...................................................................... 14

*Walker v. Wormuth,*
　2024 WL 4708981 (5th Cir. Nov. 7, 2024) (per curiam) ............................................... 12

*Walmsley v. FTC*,
    117 F.4th 1032 (8th Cir. 2024) ................................................................................ 6

*Wash. ex rel. Seattle Title Tr. Co. v. Roberge*,
    278 U.S. 116 (1928) .................................................................................................. 2

*YAPP USA Automotive Sys., Inc. v. NLRB*,
    748 F. Supp. 3d 497 (E.D. Mich. 2024), *appeal dismissed*,
    No. 24-1754, 2025 WL 2606098 (6th Cir. Aug. 4, 2025) ................................... 14

**STATUTES**

5 U.S.C. § 702 ................................................................................................................ 12

5 U.S.C. § 704 ........................................................................................... 10, 11, 12, 27

15 U.S.C. § 78s ............................................................................................................... 9

15 U.S.C. § 3051 ............................................................................................................. 1

15 U.S.C. § 3053 .................................................................................................... 4, 5, 6

15 U.S.C. § 3055 ........................................................................................................ 17-18

15 U.S.C. § 3058 .................................................................................................... *passim*

28 U.S.C. § 1331 ........................................................................................................... 12

**CONSTITUTION**

U.S. Const. amend. VII ................................................................................................ 15

**LEGISLATIVE MATERIALS**

166 Cong. Rec. H4980 (daily ed. Sept. 29, 2020) ................................................... 16

166 Cong. Rec. 169 (Sept. 29, 2020) .......................................................................... 17

Hearing Before the Subcommittee on Consumer Protection and Commerce (Jan. 28, 2020). .......... 16

H.R. Rep. No. 116-554 (2020) .................................................................................... 16

Memo. Re: Hearing on "Legislation to Promote the Health and Safety of Racehorses,"
    from Comm. Staff to Subcomm. Staff (Jan. 24, 2020) ..................................... 16

**OTHER AUTHORITIES**

2 William Blackstone, Commentaries on the Laws of England (1766) ................ 17

FTC, *HISA Anti-Doping and Medication Control Rule*, 88 Fed. Reg. 5,070 (Jan. 26, 2023) ........ 7

FTC, *Order Approving the Anti-Doping and Medication Control Rule Proposed by the Horseracing
Integrity and Safety Authority* (Mar. 27, 2023),
    https://perma.cc/H8ZH-N7FP ....................................................................... 4

HISA, *HISA Announcement Regarding Provisional Suspensions* (Nov. 4, 2024),
    https://perma.cc/83UM-H6MS ...................................................................... 8

HISA Rule 3010(e) ....................................................................................................... 4

HISA Rule 3132(a) ........................................................................................................ 7, 17

HISA Rule 3212 ........................................................................................................... *passim*

HISA Rule 3247(a)(1) ...................................................................................................... 7, 9

HISA Rule 3261 ................................................................................................................... 7

HISA Rule 3323 ................................................................................................................... 9

HISA Rule 7030 ................................................................................................................... 7

O. Bump, Fraudulent Conveyances: A Treatise upon Conveyances Made by Debtors
to Defraud Creditors (3d ed. 1882) .................................................................................. 19

## INTRODUCTION

Plaintiff Philip Serpe—a professional horse trainer charged with violating one of the Horseracing Integrity and Safety Authority's ("Authority") anti-doping and medication control rules—has sued the Authority and the Federal Trade Commission ("FTC") to challenge his administrative proceedings as unconstitutional. Plaintiff contends that the Horseracing Integrity and Safety Act, 15 U.S.C. § 3051, *et seq.* ("Act") regulatory scheme gives the private Authority too much control over Plaintiff's proceedings in violation of the private nondelegation doctrine, and further, that those proceedings violate his Seventh Amendment right to a jury trial.

Plaintiff's claims fail. The Act gives the FTC final say over all substantive and procedural rules governing Plaintiff's administrative proceedings and *de novo* review over any civil sanctions the Authority might impose. Accordingly, the Authority functions "subordinately to" and subject to "the authority and surveillance" of the FTC, which is all the private nondelegation doctrine requires. *FCC v. Consumers' Rsch.*, 606 U.S. 656, 692 (2025). Moreover, because his proceedings are ongoing, Plaintiff has not exhausted his administrative remedies or challenged final agency action that would create a cause of action under the Seventh Amendment, and his Seventh Amendment claim is also not ripe. Finally, his Seventh Amendment claim fails on the merits because his anti-doping violation is not analogous to any common law claim and falls within the public rights doctrine.

For these reasons, the Court should enter summary judgment for the Defendants and deny Plaintiff's motion for summary judgment.

## BACKGROUND

Because the Court is familiar with the background of this case and the applicable statutory framework, and to avoid providing duplicative briefing, the FTC incorporates by reference the background section of the Authority's summary judgment brief, Authority's Opp. to Pl.'s Mot. for Summ. J. and Mem. in Supp. of Cross-Mot. for Summ. J. at 3-11, ECF No. 88 ("Authority Mot.").

## ARGUMENT

I.   **Plaintiff's administrative proceedings comport with private nondelegation principles.**

   A.   **Plaintiff's proceedings are constitutional.**

Plaintiff contends that his administrative proceedings violate the private nondelegation doctrine, without fully describing how that doctrine operates.[1] *See* Pl.'s Mem. in Supp. of Mot. for Summ. J. at 10 n.1, ECF No. 83 ("Pl.'s Mot."). The Court should reject Plaintiff's argument because the Authority "function[s] subordinately" to the FTC and subject to its "authority and surveillance," and thus, the Authority's relationship with the FTC is "unquestionably valid." *Consumers' Rsch.*, 606 U.S. at 692.

For context, the private nondelegation doctrine was first applied to ordinances that allowed homeowners to set zoning requirements for their own neighborhoods. *Wash. ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116, 120-22 (1928); *Thomas Cusack Co. v. City of Chicago*, 242 U.S. 526, 530 (1917); *Eubank v. Richmond*, 226 U.S. 137, 143-44 (1912). The Supreme Court held that those ordinances were unconstitutional because they "conferr[ed] the power on some property holders to virtually control and dispose of the property rights of others," without preventing property owners from making public policy "solely for their own interest, or even capriciously." *Eubank*, 226 U.S. at 143-44. These ordinances contained "delegation[s] of power" that were "repugnant to the due process clause of the Fourteenth Amendment," *Roberge*, 278 U.S. at 122 (citing *Eubank*, 226 U.S. at 142), because they bound government to officials to the decisions of private entities not "bound by any official duty," *id.*, and gave the decisions of private entities "the effect of law," *Thomas Cusack Co.*, 242 U.S. at 531.

---

[1] Though Plaintiff purports to bring both of his claims as facial and as-applied challenges, *see* Pl.'s Mot. at 10 n.1, his brief does not even attempt to satisfy the standard for facial challenges for either claim. "[A] plaintiff cannot succeed on a facial challenge unless he establishes that no set of circumstances exist under which the law would be valid[,]" *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (citation omitted), but Plaintiff has argued only the facts of his own case. The choice to litigate a case "as [a] facial challenge[] comes at a cost," because "[f]or a host of good reasons, courts usually handle constitutional claims case by case, not en masse." *Id.* Because Plaintiff has not even tried to show that the Act is unconstitutional in the majority of applications, his facial challenges fail.

2

The Supreme Court first applied the private nondelegation doctrine to the federal government in *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936). There, the Court held unlawful a federal statute that allowed the producers of more than two-thirds of the coal in any given district to set wages and hours for all the producers in that district, unconstrained by any public agency review. *Id.* at 281-83. The Court held that "obnoxious" delegation "to private persons whose interests may be and often are adverse to the interests of others in the same business" was "a denial of rights safeguarded by the due process clause[.]" *Id.* at 311.

Soon thereafter, however, the Supreme Court clarified that government agencies may still "rely on advice and assistance from private actors." *Consumers' Rsch.*, 606 U.S. at 692 (citation modified). After *Carter Coal*, Congress enacted a new statute under which local boards of private coal producers would "operate as an aid to the [National Bituminous Coal] Commission but subject to its pervasive surveillance and authority." *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388 (1940). The new statute "specifie[d] in detail the methods of [the boards'] organization and operation, the scope of their functions, and the jurisdiction of the Commission over them." *Id.* The statute "permitt[ed] boards of coal companies to propose minimum coal prices to a Government agency for approval, disapproval, or modification.'" *Consumers' Rsch.*, 606 U.S. at 692 (citation omitted). In reviewing this revised scheme, the Court held that no constitutional problem arose merely from private industry involvement. *Adkins*, 310 U.S. at 399. The revised scheme was permissible because "members of the code function subordinately to" the agency and were subject to its "authority and surveillance[.]" *Id.* Thus, the government agency and "not the code authorities, determine[d] the prices," and "[s]ince lawmaking [was] not entrusted to the industry," the "scheme [was] unquestionably valid." *Id.*

The Supreme Court's 2025 decision in *Consumers' Research* reaffirmed that these remain the principles governing private delegations. *See* 606 U.S. at 692-95. So long as a private entity functions "subordinately to" and subject to "the authority and surveillance of" a government agency, the Constitution allows a government agency to rely on the advice and assistance of a private entity. *Id.* at 692 (quoting *Carter Coal*, 310 U.S. at 399).

3

Under this standard, Plaintiff's private nondelegation claim fails. The Act "gives the FTC supervision over the rules that govern the horseracing industry." *Oklahoma v. United States*, 163 F.4th 294, 308 (6th Cir. 2025) ("*Oklahoma II*"). "The Act permits [the Authority] to draft proposed rules on racetrack safety and anti-doping matters," "[b]ut they are just that: proposals." *Id.* "No such proposal becomes a binding rule until the FTC approves it[.]" *Id.*; 15 U.S.C. § 3053(b)(2) ("A proposed rule . . . of the Authority shall not take effect unless the proposed rule . . . has been approved by the Commission."). This includes all applicable rules governing investigations, charging, adjudication, and sanctions for anti-doping and medication control rule violations. *See* Defs.' Supp. Statement of Material Facts ¶ 41, ECF No. 86 ("DSMF"); HISA Rule 3010(e); FTC, *Order Approving the Anti-Doping and Medication Control Rule Proposed by the Horseracing Integrity and Safety Authority* (Mar. 27, 2023), https://perma.cc/H8ZH-N7FP. Therefore, no anti-doping violation may be investigated, charged, or adjudicated against a covered person unless it is brought under the procedures the FTC has approved, and the entire enforcement process is subject to FTC supervision. For instance, the FTC recently approved a rule modification that "require[s] the Authority to request and obtain the approval of the [FTC] before issuing a subpoena" and "establish[es] a set of standards by which subpoenas are issued." *See* FTC, *Order Approving the Enforcement Rule Modification Proposed by the Horseracing Integrity and Safety Authority* at 16-19 (Dec. 19, 2025), https://perma.cc/BE5D-7G9S. The FTC explained that this change "help[s] safeguard against overreach and ensure[s] that the Authority remains at all times subordinate to the Commission, including in the use of investigatory powers." *Id.* at 19. The bottom line is the Act gives the FTC the power to supervise the Authority however it sees fit. That is all the private nondelegation doctrine requires.

The FTC also has the final say over all sanctions imposed by the Authority. *See Oklahoma II*, 163 F.4th at 308 ("No sanction thus goes into final effect without the FTC's 'say-so.'" (quoting *Consumers' Rsch.*, 606 U.S. at 695)). Under the Act, "[i]f the Authority imposes a final civil sanction for a violation committed by a covered person pursuant to the rules or standards of the Authority, the Authority shall promptly submit to the [FTC] notice of the civil sanction." 15 U.S.C. § 3058(a). And

"[w]ith respect to a final civil sanction imposed by the Authority, on application by the Commission or a person aggrieved by the civil sanction . . . the civil sanction shall be subject to de novo review by an administrative law judge" ("ALJ"), *id.* § 3058(b)(1), who "may affirm, reverse, modify, set aside, or remand for further proceedings, in whole or in part, the final civil sanction of the Authority." *Id.* § 3058(b)(3)(A)(ii). For its part, the Commission may review "any decision of an [ALJ]," whether on its own motion, *id.* § 3058(c)(1), or upon petition for review by "the Authority or a person aggrieved by" the ALJ's decision, *id.* § 3058(c)(2). The scope of the Commission's review is broad: it may "affirm, reverse, modify, set aside, or remand" the ALJ's decision and "make any finding or conclusion that, in the judgment of the Commission, is proper and based on the record[,]" *id.* § 3058(c)(3)(A); it "shall review de novo" the ALJ's factual findings and conclusions of law, id. § 3058(c)(3)(B); and it may consider additional evidence on motion of the Commission or a party, *id.* § 3058(c)(3)(C).

Finally, the Act also "gives the FTC authority, as it 'finds necessary or appropriate,' to 'abrogate, add to, and modify' the rules." *Oklahoma II*, 163 F.4th at 308 (quoting 15 U.S.C. § 3053(c)(2)). This means the FTC has the power to issue rules addressing any concerns it may have with how the Authority is investigating, charging, adjudicating, and sanctioning violations generally or even as to a specific covered person. *See id.* at 310 ("In full, § 5053(e) gives the FTC ultimate discretion over the content of the rules that govern the horseracing industry and [the Authority's] implementation of those rules."). The Sixth Circuit recently described how this authority ensures the FTC's control over the Authority's enforcement practices, explaining that "Section 3053(e) gives the FTC tools to bring an overzealous [Authority] to heel." *Id.* at 312. For instance, if the FTC disagreed with the Authority's enforcement practices, it could promulgate "rules constraining the Authority's investigations and increasing the procedural rights of suspected rulebreakers," "abrogate rules that lead to petty violations," or "require that the Authority seek its authority before investigating an incident." *Id.* If the FTC had more specific concerns, it "could promulgate rules requiring . . . that the Authority drop a misguided investigation into a particular jockey, or conversely, that [it] pursue an enforcement action against a recalcitrant rule breaker." *Id.* As the Sixth Circuit explained, through § 3053(e), "the FTC's capacity to

5

control the Authority's enforcement activities ensures that the FTC, not [the Authority], is the agency of ultimate resort that decides how the federal government enforces the Act," *id.*, and that suffices for private nondelegation purposes.

It is thus no surprise that all three circuits that have considered private nondelegation challenges to the Act's rulemaking structure, and two out of three circuits that have considered challenges to its enforcement structure, have found it constitutional. *See Oklahoma v. United States*, 62 F.4th 221, 229-33 (6th Cir. 2023) ("*Oklahoma I*") (explaining "all told, the Horseracing Authority is subject to the FTC's pervasive surveillance and authority, revealing the Authority operates as an aid to the FTC, nothing more," and rejecting both rulemaking and enforcement challenges to the Act (citation modified)), *vacated* 145 S. Ct. 2836 (2025) (Mem.); *Walmsley v. FTC*, 117 F.4th 1032, 1039 (8th Cir. 2024) (holding that "the Act's rulemaking structure does not violate the private nondelegation doctrine" and that "statute is not unconstitutional on its face because the Commission's rulemaking and revision power gives it pervasive oversight and control of the Authority's enforcement activities" (citation modified)), *vacated* 145 S. Ct. 2870 (2025) (Mem.); *Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*, 107 F.4th 415, 424 (5th Cir. 2024) ("*NHBPA II*") (holding that "[b]ecause the FTC has ultimate say on what the rules are, the Authority's power to propose horseracing rules does not violate the private nondelegation doctrine," but that the "Authority does not function subordinately to the FTC when enforcing HISA"), *vacated* 145 S. Ct. 2837 (2025) (Mem.). Although the Supreme Court recently granted the petitions for certiorari in all three of those cases, vacated the judgments, and remanded for further consideration in light of *Consumers' Research*, as explained above, *Consumers' Research* only confirmed that the same principles set forth in *Adkins* continue to govern the private nondelegation doctrine. It is thus no surprise that, on remand, the Sixth Circuit again concluded that both the Act's rulemaking and enforcement provisions comport with those principles (as discussed above). *See Oklahoma II*, 163 F.4th 294 ("The Horseracing Authority is subordinate to the agency. The Authority yields to FTC supervision and lacks the final say over rulemaking and enforcement of the law[.]").[2]

---

[2] Remand proceedings remain ongoing in *Walmsley* and *NHBPA*.

6

Further, when reviewing the comparable statutory scheme involving the Securities and Exchange Commission ("SEC") and private self-regulatory organizations ("SROs"), courts have held "[i]n case after case," that "the SEC's ultimate control over the rules and their enforcement makes the SROs permissible aides and advisors." *Oklahoma*, 62 F.4th at 229; *see, e.g., Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952); *Todd & Co. v. SEC*, 557 F.2d 1008, 1012-13 (3d Cir. 1977); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 697 (3d Cir. 1979); *Sorrell v. SEC*, 679 F.2d 1323, 1325-26 (9th Cir. 1982).

### B. Plaintiff's arguments fail to show that his adjudication violates the private nondelegation doctrine.

For all the reasons above, the Act and the FTC and Authority's application of the Act's regulatory scheme to Plaintiff do not violate the private nondelegation doctrine. Plaintiff's arguments to the contrary fail to show otherwise.

*First*, Plaintiff claims that the Horseracing Integrity and Welfare Unit's ("HIWU")[3] collection and testing of urine and blood samples, charging of an anti-doping and medication control rules violation, and arbitration of that charge violate the private nondelegation doctrine because those actions supposedly occurred without FTC involvement. *See* Pl.'s Mot. at 14-16. But as Plaintiff acknowledges, each of those steps occurred under specific procedures provided for in the governing rules. *See id.* (citing HISA Rules 3132(a), (c), 3212, 3247(a)(1), 3261, 7030). And as described above, all of those rules—and any others potentially relevant—could not (and did not) go into effect until they were reviewed and approved by the FTC. *See* DSMF ¶ 41; FTC, *HISA Anti-Doping and Medication Control Rule*, 88 Fed. Reg. 5,070 (Jan. 26, 2023). Further, if the FTC had an issue with how the Authority was performing these approved enforcement activities, it is empowered under § 3053(e) authority to abrogate, add to, or modify the existing rules to require the Authority to do things differently. That the FTC could be described as having chosen "inaction" here does not change that "the FTC *could* subordinate every aspect of the Authority's enforcement." *Oklahoma II*, 163 F.4th at 312; *see also Consumers' Research*, 606 U.S. at 695 ("[T]he relevant legal question is not how often the FCC revises the

---

[3] HIWU is the Authority's independent enforcement agency.

7

Administrator's projections, just as in *Sunshine Anthracite* it was not how often the agency rejected the coal companies' pricing advice. It is sufficient in such schemes that the private party's recommendations (as is true here) cannot go into effect without an agency's say-so, regardless of how freely given."). And of course, the FTC also maintains the power to review the Authority's conduct after the fact— as it is already doing in this very case. *See* Joint Statement of Undisputed Material Facts ¶¶ 47-58, ECF No. 84 ("JSMF"); FTC, Administrative Law Judge Decision of Application for Review, ECF No. 58-1 ("ALJ Decision"); FTC, Order Partially Staying Administrative Law Judge's Decision, Granting Review, and Ordering Briefing Schedule, ECF No. 59-1 ("Commission Review Order"). This satisfies the private nondelegation doctrine. Plaintiff's evident preference that the FTC "micromanage every particularized decision the Authority makes in an investigation," does not change that the FTC's "[s]erial layers of review of any proposed sanctions, together with [its] rulemaking powers over enforcement actions, give it 'pervasive' oversight and control of the Authority's enforcement activities." *Oklahoma II*, 163 F.4th at 312 (quoting *Adkins*, 310 U.S. at 388).

*Second*, Plaintiff characterizes investigation, charging, and adjudication as executive powers reserved to the FTC alone. But in doing so, Plaintiff cites cases outside the private nondelegation context. *See* Pl.'s Mot. at 14-16. And the critical question, as endorsed by the Supreme Court in *Consumers' Research*, is whether the government agency retains sufficient control over the private entity. Because the FTC has final say over what rules govern these processes and what sanctions are imposed in particular cases, it retains sufficient control of these functions— whatever their nature—to satisfy the nondelegation doctrine.

*Third*, Plaintiff challenges the Authority's imposition of (1) a provisional suspension and (2) a two-year suspension without FTC review. *See id.* at 15-16. Neither creates a private nondelegation issue. As to the provisional suspension, Plaintiff's claim on this point is now moot: Plaintiff has already served (and then was no longer subject) to a provisional suspension. JSMF ¶ 25. And now the Authority no longer imposes provisional suspensions in the ordinary course. *Id.*; HISA, *HISA Announcement Regarding Provisional Suspensions* (Nov. 4, 2024), ECF No. 29-1 (also available at

8

https://perma.cc/83UM-H6MS). At any rate, Plaintiff cites the FTC-approved rule providing that HIWU would ordinarily impose provisional suspensions for alleged violations of the banned-substances rules. *See* Pl.'s Mot. at 15 (citing HISA Rule 3247(a)(1)).

Plaintiff's two-year suspension was also imposed pursuant to an FTC-approved rule. *See* ALJ Decision at 15-16 (citing HISA Rule 3223). And at least as importantly, the FTC—both an FTC ALJ and the full Commission—will itself review Plaintiff's case before that suspension becomes final. Indeed, the full Commission immediately stayed the monetary fine imposed by the ALJ, JSMF ¶ 47; that it declined to stay Plaintiff's suspension does not mean that it lacked the authority to do so, just that it chose not to exercise its discretion in that way. Taken together, these facts establish that the FTC has the final say over the suspension imposed on Plaintiff, and the suspension thus raises no private nondelegation concerns.

Plaintiff cites *Alpine Securities Corp. v. FINRA*, 121 F.4th 1314 (D.C. Cir. 2024), in support of this argument, but that case supports Defendants, not Plaintiff. The plaintiff in that case asserted that the private Financial Industry Regulatory Authority ("FINRA") could not constitutionally expel one of its members through its own expedited proceedings—which "effectively amount[ed] to expulsion from the securities industry as a whole," *id.* at 1326—before the SEC had the opportunity to review the decision. Under the regulatory scheme at issue there, however, an expulsion took "effect immediately upon the issuance and prompt service of FINRA's decision," and federal law specified "that the SEC review must wait until *after* FINRA has issued its final decision and imposed any sanction." *Id.* (citing 15 U.S.C. § 78s(d)(1)-(2)). "Taken together," the D.C. Circuit concluded, "those provisions mean that SEC review can come only after, and not before, the expulsion takes effect," *id.*, and this created a private nondelegation problem, particularly in light of the gravity and finality of the penalty imposed. Here, by contrast, the arbitrator's suspension decision was not effective immediately: the arbitrator's decision issued July 9, 2025, but the suspension was not effective until July 15, 2025. JSMF ¶¶ 33, 39. Plaintiff could have sought a stay of the suspension from the FTC during that 6-day period, *see* 15 U.S.C. § 3058(d), but did not. Nor did he even challenge his liability for the violation or the

9

imposition of the suspension in his appeal to the ALJ. DSMF ¶¶ 51-55; Notice of Appeal and Application for Review (July 15, 2025), ECF No. 50-6. Plaintiff cannot claim he suffered some sort of constitutional harm from lack of FTC review when he had the opportunity to seek such review, but opted not to.

For all these reasons, Plaintiff's private nondelegation claim fails as a matter of law.

## II.   Plaintiff cannot prevail on his Seventh Amendment claim.

### A.   The Court should not reach the merits of Plaintiff's Seventh Amendment claim.

As a threshold matter, the Court should not reach the merits of Plaintiff's Seventh Amendment claim for several reasons: Plaintiff has not exhausted his administrative remedies, as required by the Administrative Procedure Act ("APA"); there is no reviewable final agency action; and he cannot satisfy the ripeness doctrine.

"Generally, when Congress creates procedures designed to permit agency expertise to be brought to bear on particular problems, those procedures are to be exclusive." *Free Enter. Fund v. Pub. Accounting and Oversight Bd.*, 561 U.S. 477, 489 (2010); *see also Carr v. Saul*, 593 U.S. 83, 88 (2021) ("Administrative review schemes commonly require parties to give the agency an opportunity to address an issue before seeking review of that question."). And here, the Act makes clear that Congress contemplated that challenges to an adjudication would be subject to APA review *after* the conclusion of administrative proceedings. *See* 15 U.S.C. § 3058(b)(3)(B); *id.* § 3058(c)(2)(B) (designating which agency decisions are "final").

Under the APA, "judicial review is not available until 'an aggrieved party has exhausted all administrative remedies expressly prescribed by statute or agency rule.'" *Ibarra v. Swacina*, 628 F.3d 1269 (11th Cir. 2010) (quoting *Darby v. Cisneros*, 509 U.S. 137, 146 (1993)). "At that point the agency action is final . . . and therefore subject to judicial review." *Id.* (citation modified) (citing 5 U.S.C. § 704). Relatedly, the APA only "authorizes review of 'final agency actions.'" *Fla. Agency for Health Care Admin. v. Admin. for Ctrs. for Medicare & Medicaid Servs.*, 161 F.4th 765, 776 (11th Cir. 2025) (quoting 5 U.S.C. § 704). "Two conditions generally must be satisfied for agency action to be final under the

10

APA." *Id.* (citation omitted). "The action must (1) 'mark the consummation of the agency's deci-sionmaking process' *and* (2) 'be one from which rights or obligations have been determined, or from which legal consequences will flow.'" *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)) (em-phasis added)). "This two-prong framework . . . [is] the black letter standard," and both of these "two conditions must be satisfied for agency action to be final." *Okeelanta Corp. v. U.S. Army Corps of Eng'rs*, 132 F.4th 1320, 1333 (11th Cir. 2025) (citations omitted).

Plaintiff has not satisfied the APA's exhaustion and finality requirements. Because Plaintiff's administrative proceedings remain ongoing and the Commission may address the same Seventh Amendment claim he raises here, he has neither exhausted his administrative remedies nor challenged reviewable final agency action. *See* JSMF ¶ 49. By statute, the Commission has the authority to "affirm, reverse, modify, set aside, or remand" the ALJ's decision and "make any finding or conclusion that, in the judgement of the Commission, is proper and based on the record." 15 U.S.C. § 3058(c)(3)(A). The Commission's review is *de novo*, and it may consider additional evidence. *Id.* § 3058(c)(3)(B), (C). Therefore, the Commission could remedy any potential Seventh Amendment injury through the ad-ministrative process, obviating any need to seek relief from this Court. And even if the Commission did not resolve Plaintiff's claim in its entirety, its decision would likely affect whatever might remain to be judicially reviewed. For instance, the arguments before this Court would change substantially if the Commission invalidated the ALJ's imposition of the monetary fine—as the Commission has al-ready signaled it is considering through its order exercising *sua sponte* review, staying the fine, and directing to the parties to brief whether the ALJ was authorized to impose the fine. *See* JSMF ¶¶ 47, 49; Commission Review Order.

For similar reasons, there is no final agency action. Because the Commission has exercised its authority to *sua sponte* review the ALJ's decision, but has not issued its final decision, there has been no consummation of the agency's decisionmaking process. *See* JSMF ¶¶ 47-49; 15 U.S.C. § 3058(b)(3)(B) ("A decision by [the ALJ] shall constitute the decision of the Commission without further proceedings *unless* a notice or application for review is timely filed[.]" (emphasis added)). To

the extent portions of the arbitrator's and the ALJ's decisions remain in effect pending Commission review, they are "of a merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 178. The Commission has not yet had the final word, and for purposes of APA review the result is clear: "No final administrative decision, no judicial review." *Okeelanta Corp*, 132 F.4th at 1333 (citation omitted).

Plaintiff cannot circumvent the APA's requirements simply by invoking 28 U.S.C. § 1331 as a basis for jurisdiction. To "raise a claim in federal court," a plaintiff "must demonstrate *both* that a federal court will have jurisdiction over [its] claim, *and also* that [the plaintiff] has a right of action to initiate that claim." *Harris Cty. v. MERSCORP Inc.*, 791 F.3d 545, 552 (5th Cir. 2015) (emphasis added). "In other words, establishing the court's jurisdiction and the litigants' right of action are two requirements that must be satisfied independently." *Id.* (citing *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 455-56 (1974)); *see also Soul Quest Church of Mother Earth, Inc. v. Att'y Gen., U.S.*, 92 F.4th 953, 969 (11th Cir. 2023) (same). "Section 1331 does not create an independent private right of action. Instead, when seeking review of an agency action, the APA is a vehicle for federal question jurisdiction." *Walker v. Wormuth*, 2024 WL 4708981, at *2 n.1 (5th Cir. Nov. 7, 2024) (per curiam) (citation modified); *Stieglitz v. IronMountain Sols., Inc.*, 2024 WL 6895827, at *8 (N.D. Ala. Nov. 12, 2024) ("Federal courts have federal question subject matter jurisdiction under § 1331 only when Congress explicitly or implicitly has created a private right of action independent of this section supporting a given plaintiff's claim." (quoting *Storey v. Rubin*, 976 F. Supp. 1478, 1483 (N.D. Ga. 1997)).

Plaintiff's motion points to no other authority that supplies a private right of action to bring his Seventh Amendment claim, other than the APA. *See* Pl.'s Mot. at 11 n.2 (citing 5 U.S.C. § 704); *see also* Compl. at 22 (citing 5 U.S.C. § 702). While Plaintiff's complaint also invokes an "Implied Equitable Cause of Action," neither it nor Plaintiff's summary judgment briefing identifies any court decision recognizing an implied equitable cause of action for Seventh Amendment claims. *See Egbert v. Boule*, 596 U.S. 482, 491-92 (2022) (emphasizing that implied constitutional causes of action are disfavored). Plaintiff therefore must assert this constitutional claim under the APA or not at all. *See, e.g.*, *Alexander v. Trump*, 753 F. App'x 201, 206 (5th Cir. 2018) (dismissing claims challenging an agency action that

12

were asserted "direct[ly]" under the Constitution); *Ketcham v. U.S. Nat'l Park Serv.*, 2016 WL 4268346, at *1-2 (D. Wyo. Mar. 29, 2016) (rejecting the notion that a plaintiff can assert a "stand-alone constitutional challenge" to an agency action separate from APA). And under the APA, Plaintiff must exhaust his administrative remedies and can only challenge final agency action.

Plaintiff's citation to *Axon Enterprises, Inc. v. FTC*, 598 U.S. 175 (2023), does not help him. The question decided in *Axon* was whether special statutory review schemes can strip district courts of *jurisdiction* over structural constitutional challenges, *id.* at 180, which as explained, is distinct from whether a plaintiff has a right of action. And importantly, Plaintiff's Seventh Amendment claim is substantively distinct from the claims in *Axon*. Those claims challenged the "structure or very existence of an agency" on the theory that the agency was "wielding authority unconstitutionally in all or a broad swath of its work," and they were untethered from any "specific substantive decision" in the petitioners' agency proceedings. *Id.* at 189. Indeed, the petitioners in *Axon* would have had the "same claim" even if they had "*won* before the agency." *Id.* at 191. The same is not true of Plaintiff's Seventh Amendment claim, which is completely intertwined with the specific charges, sanctions, and outcome of his administrative proceedings. *See, e.g.*, Pl.'s Mot. at 17-22 (arguing Seventh Amendment claim based on (1) the fine "of up to $25,000 or 25% of the total purse (whichever is greater)" that may be imposed against him and (2) the "nature" of the "Banned Substances Claim against Serpe"). Plaintiff would have no Seventh Amendment claim if he were found not liable for the HISA Rule 3212 violation, and at a minimum, his claim would change substantially if no fine were ultimately imposed. Unlike the structural constitutional claims raised by the petitioners in *Axon*, Plaintiff's Seventh Amendment claim does not challenge the FTC's "power generally" to discipline covered persons; he instead challenges something "particular about how that power [i]s wielded"—namely, that some types of charges may be brought without the procedural protection of a jury trial. *Axon*, 598 U.S. at 193, 189.

That Seventh Amendment claims are different in kind from the structural constitutional claims at issue in *Axon* is evident from recent caselaw. Post-*Axon*, many district courts have held that they

13

still lack jurisdiction to hear collateral Seventh Amendment challenges to ongoing agency proceedings, and instead, have recognized that those claims must be channeled through statutory review schemes.[4] Consequently, there is no reason for this Court to conclude that whatever cause of action was available for the claims in *Axon* is also available to Plaintiff here.

In addition to Plaintiff's failure to exhaust his administrative remedies, challenge final agency action, or identify a cause of action, Plaintiff's claim is unripe. Simply put: Plaintiff may, in part, be challenging a fine he may never have to pay. The Commission has not yet had the opportunity to address Plaintiff's Seventh Amendment claim, nor has it addressed any Seventh Amendment challenge to HISA proceedings after the Supreme Court's decision in *SEC v. Jarkesy*, 603 U.S. 109 (2024). Because Plaintiff's arguments are contingent upon whether the Commission affirms, reverses, or modifies the sanctions originally imposed by the arbitrator as well as the fine imposed by the ALJ, they are not ripe. *See Trump v. New York*, 592 U.S. 125, 131 (2020) (explaining Article III requires that a case "must be ripe—not dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all." (citations omitted)); *Florida v. Dep't of Health & Human Servs.*, 739 F. Supp. 3d 1091, 1102 (M.D. Fla. 2024) (explaining that in analyzing ripeness "courts are generally concerned with questions of finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed" (citations omitted)).

For these reasons, the Court should decline to reach the merits of Plaintiff's Seventh Amendment claim.

### C. Plaintiff's adjudication comports with the Seventh Amendment.

Even setting threshold issues aside, Plaintiff cannot prevail on his Seventh Amendment claim.

---

[4] *See, e.g.*, *Millenia Hous. Mgmt. v. U.S. Dep't of Hous. & Urban Dev.*, 735 F. Supp. 3d. 1051, 1063, 1066 (N.D. Ohio 2025); *NCRNC, LLC v. Kennedy*, 786 F. Supp. 3d 496, 508(N.D.N.Y. 2025); *Vape Cent. Grp. v. FDA*, 2025 WL 637416, at *9 (D.D.C. Feb. 27, 2025); *Huff and Puffers, LLC v. FDA*, 2025 WL 1092696, at *6 (C.D. Cal. Feb. 27, 2025); *Waffle House, Inc. v. NLRB*, 2025 WL 602744, at *9 (D.S.C. Feb. 10, 2025); *VHS Acquisition Subsidiary No. 7 v. NLRB*, 808 F. Supp. 3d 1, 3, 4(D.D.C. 2024); *YAPP USA Automotive Sys., Inc. v. NLRB*, 748 F. Supp. 3d 497, 512-14 (E.D. Mich. 2024), *appeal dismissed*, No. 24-1754, 2025 WL 2606098 (6th Cir. Aug. 4, 2025); *Nexstar Media, Inc. Grp. v. NLRB*, 746 F. Supp. 3d 464, 473 (N.D. Ohio 2024).

14

The Seventh Amendment provides that "the right of trial by jury shall be preserved" for "Suits at common law, where the value in controversy shall exceed twenty dollars." U.S. Const. amend. VII. The Seventh Amendment thus "preserve[s] the right to jury trial as it existed in 1791" and applies to "statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts" at the Founding (as opposed to claims in equity and admiralty). *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41-42 (1989) (citation omitted). A claim implicates the Seventh Amendment if it is "legal in nature"—an inquiry that turns on "the cause of action" and "remedy" at issue, with the remedy being the "more important" factor. *Jarkesy*, 603 U.S. at 122-23 (citation modified). Even if a claim implicates the Seventh Amendment, a jury trial is not required if the matter involves "public rights" as opposed to "private rights" that are "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." *Id.* at 127-28.

Relying on the Supreme Court's decision in *Jarkesy*, Plaintiff insists he is entitled to a jury trial for the anti-doping and medication control rule violation (or "banned substances" or "HISA Rule 3212" claim) brought against him. Turning to the first inquiry under *Jarkesy*—remedy—Plaintiff makes no attempt to explain how the sanctions imposed by the arbitrator's decision are the "type[s] of remed[ies] at common law that could only be enforced in the courts of law." *Id.* at 123-25; *see also* JSMF ¶ 38; Arbitration Decision at 15-16, ECF No. 50-4 (imposing the following sanctions: (1) disqualification of the results that Fast Kimmie obtained in the horserace at issue, including the forfeiture of all purses and other compensation, prizes, trophies, points, and rankings and repayment or surrender (as applicable) to the race organizer; (2) a two-year period of ineligibility for Plaintiff; and (3) public disclosure). To the contrary, as Plaintiff has acknowledged, these sanctions are "equitable" in nature. *See* Pl.'s Renewed Mot. for Prelim. Inj. at 1, ECF No. 50-1; *see also Liu v. SEC*, 591 U.S. 71, 80-81 (2020) (explaining that disgorgement falls "squarely within the heartland of equity"); *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 719 (1991) ("It is settled law that the Seventh Amendment does not apply" to "suits seeking only injunctive relief" or other forms of "equitable relief").

Plaintiff instead focuses on his comparison of Authority "fines" to the civil monetary penalties

at issue in *Jarkesy*. But the Authority did not seek such a fine against Plaintiff, DSMF ¶ 44, and when one was imposed *sua sponte* by the ALJ, JSMF ¶¶ 43-44, the Commission immediately, on its own motion, exercised its authority to review that decision and stay the fine, *id.* ¶ 47. *See also* Commission Review Order (staying monetary fine and granting Commission review). There is therefore no final decision imposing a fine that could support a Seventh Amendment merits decision on that basis. *Cf. AT&T, Inc. v. FCC*, 149 F.4th 491 (5th Cir. 2025) (holding Seventh Amendment was violated when the Commission issued a final decision imposing a $57 million penalty and Plaintiff paid that penalty), *cert. granted sub nom.*, *FCC v. ATT&T, Inc.*, --- S. Ct. ---, 2026 WL 73092 (Jan. 9, 2026).

Turning to the second inquiry under *Jarkesy*, the anti-doping violation with which Plaintiff has been charged does not resemble any pre-existing action at common law; rather, it seeks to address an issue that the common law did not address. The Act was passed in 2020 primarily to address serious health and safety risks to both horses and jockeys. At that time, the sport had been "marred by accidents," 166 Cong. Rec. H4980 (daily ed. Sept. 29, 2020) (statement of Rep. Pallone), and Thoroughbreds were dying from race-related injuries at a rate two-to-five times greater than in Europe or Asia. H.R. Rep. No. 116-554, at 17 (2020). "Many factors" contributed to these problems, including the "use of performance enhancing drugs (PEDs) and certain therapeutic medications." *Id.*; *see also* Memo. Re: Hearing on "Legislation to Promote the Health and Safety of Racehorses," from Comm. Staff to Subcomm. Staff at 1-3 (Jan. 24, 2020) (discussing how PEDs may be contributing to accidents). Indeed, these concerns were highlighted during congressional deliberations. For instance, in a subcommittee hearing, Representative Schakowsky explained that legislation was "vital for the health of equine animals, jockeys, and horseracing itself," because the existing "[p]atchwork oversight, and spotty regulation means horses are often treated with drugs designed to enhance their performance without concern for their health." Hearing Before the Subcommittee on Consumer Protection and Commerce at 1-2 (Jan. 28, 2020). In turn, "[j]ockeys face real danger as well" "[b]ecause doped horses are more likely to fall and injure themselves." *Id.* at 2; *see also id.* at 6 (Statement of Rep. Pallone) (explaining the "success of the sport rides on the health of its star athletes, the horses and the jockeys," that the

16

committee planned to "explor[e] ways to protect horses from injury and improve the general health of horses, from examining the effect of track conditions, reducing the risk of injury, and the best use medications," and emphasizing "the welfare of the racehorses is of the utmost importance and that the sport should be safe"); *see also* 166 Cong. Rec. 169 (Sept. 29, 2020) (Statement of Rep. Tonko) (explaining bill "puts the equine athlete at the epicenter of this legislation and concern").

This is a substantial departure from common law tradition, in which domestic animals, such as horses, were the "absolute" property of man. 2 William Blackstone, Commentaries on the Laws of England *389-90 (1766). Accordingly, "at common law, cruelty to an animal merely upon the ground that it gave pain to the animal and for the protection or for the sake of the animal was not indictable." *People v. Brunell*, 48 How. Pr. 435, 43 (N.Y. Gen. Sess. 1874). Indeed, early state statutes to address the treatment of animals were promulgated precisely because there was no equivalent "common law offense." *Id.*; *see also Grise v. State*, 37 Ark. 456, 458 (1881) (explaining that contemporary state laws were "of comparatively recent origin" and reflected an "attempt to transcend what had been thought, at common law, the practical limits of municipal government"). Thus, "because traditional rights and remedies were inadequate to cope with a manifest public problem," Congress passed in the Act— which empowered the FTC and the Authority to adopt the anti-doping and medication control rules— "new cause[s] of action, and remedies therefor, unknown to the common law." *Granfinanciera*, 492 U.S. at 60.

Further, the Act (and HISA Rule 3212) does not seek to "regulate transactions between private individuals," *Jarkesy*, 603 U.S. at 135, or to determine "the liability of one individual to another" in a manner that would implicate private rights, *Crowell v. Benson*, 285 U.S. 22, 51 (1932). Liability does not turn on whether a doped horse wins a competition, or whether any racing official or member of the betting public was deceived into thinking a horse was not medicated. *See, e.g.*, HISA Rule 3132(a) ("The Agency has authority to conduct Testing on any Covered Horse both in and out of competition."). And in enforcing HISA Rule 3212, the Authority does not step into the shoes of a competitor or a competition organizer—instead, it merely seeks to enforce the anti-doping and medication control

rules that Congress empowered the Authority and the FTC to enact to stop this dangerous practice. *See* 15 U.S.C. § 3055 ("[T]he Authority shall establish a horseracing anti-doping and medication control program applicable to all covered horses, covered persons, and covered horseraces[.]").

Much of Plaintiff's brief attempts to analogize his banned substances violation to various actions in common law—a change from his previous focus on the imposition of a monetary fine. *See generally* ECF No. 50-1. At any rate, Plaintiff's attempts are unpersuasive because none of the causes of action he cites even come close to "target[ing]] the same basic conduct" at issue here: the presence of a banned substance in a Thoroughbred racehorse. *Jarkesy*, 603 U.S. at 125.

*First*, Plaintiff argues that the Authority's imposition of a monetary fine is analogous to an action in debt. But the same could be said for all monetary penalties, yet Congress can constitutionally direct the Executive Branch to impose penalties for tax violations, *Helvering v. Mitchell*, 303 U.S. 391, 401-02 (1938), or violations of the immigration laws, *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339-40 (1909), without offending the Seventh Amendment. And unlike an action in debt, Rule 3212 targets specific conduct beyond mere repayment of money—namely, the improper medication of racehorses—and further, it imposes a range of potential sanctions, with a monetary fine being only one potential option (and one that remains very much not final in Plaintiff's proceedings).

*Second*, Plaintiff attempts to analogize his banned substances violation to a common-law fraud claim. *See* Pl.'s Mot. at 19-20. But a comparison of the elements of a HISA Rule 3212 violation to the elements of common-law fraud illustrates that the claims target fundamentally different conduct. Under Rule 3212, "[t]he general rule is that the presence of any amount of a Banned Substance . . . in a Sample collected from a Covered Horse constitutes an Anti-Doping Rule Violation by the Responsible Person of that Covered Horse." HISA Rule 3212(a). The Rule also makes clear that "[i]t is the personal and non-delegable duty of the Responsible Person to ensure that no Banned Substance is present in the body of their Covered Horse(s)," and when a banned substance is found to be present, the responsible person is "strictly liable." HISA Rule 3212(c). "Accordingly, it is not necessary to demonstrate intent, Fault, negligence, or knowing Use on the part of the Responsible Person in order to

18

establish that the Responsible Person has committed a Rule 3212 Anti-Doping Violation." *Id.* By contrast, the elements of a common law fraud claim are "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Manis v. U.S. Dep't of Agric.*, 796 F. Supp. 3d 178, 205 (M.D.N.C. 2025), *appeal filed*, No. 25-2001 (4th Cir. Aug. 28, 2025). There is almost no overlap between the two. The presence of a banned substance is not clearly analogous to a false representation of a material fact. And even more importantly, Rule 3212 requires no scienter whatsoever on the part of the responsible person, much less intent or knowledge of the presence of a banned substance, or intent to mislead anyone else through the presence of a banned substance. Nor does Rule 3212 require that anyone—be it a race organizer, an individual connected to the covered horse, or the betting public—relied on or was injured by the presence of the banned substance. Rule 3212 instead reflects a "strict liability regime primarily intended to put an end to what Congress recognized as a" dangerous practice. *Id.* at 206. This conduct is distinct from fraud, which focuses on the misleading of another to that person's detriment.

Plaintiff's comparison to common law fraudulent conveyance fares no better. *See* Pl.'s Mot. at 20. "The modern law of fraudulent transfers had its origin in the Statute of 13 Elizabeth, which invalidated 'convinous and fraudulent' transfers designed 'to delay, hinder or defraud creditors and others." *BFP v. Res. Trust Corp.*, 511 U.S. 531, 540 (1994) (quoting 13 Eliz., ch. 5 (1570)); O. Bump, Fraudulent Conveyances: A Treatise upon Conveyances Made by Debtors to Defraud Creditors at 13-14 (3d ed. 1882) (explaining the elements of a fraudulent conveyance include (1) "the existence of an intent to delay, hinder, or defraud," (2) "the consideration," and (3) "the bona fides of the transfer."). Contrary to Plaintiff's suggestion, this cause of action also requires fraudulent intent as well as a conveyance or transfer of property at issue. HISA Rule 3212 requires neither, demonstrating that it targets different conduct. Plaintiff's comparison to a money damage claim for cheating during gambling games is also inapt. *See* Pl.'s Mot. at 20. Rule 3212 imposes liability regardless of whether the doped horse placed well or poorly in a covered race, or whether the betting public won or lost money on that race or that

19

horse. Nor does Rule 3212 require money damages. Imposing consequences for the mere presence of a banned substance in a covered horse is thus distinct from any cause of action for cheating.

*Third*, Plaintiff attempts to analogize Rule 3212 to common law negligence. *See* Pl.'s Mot. at 20-21. But again, an analysis of the elements of negligence reveals that negligence targets different conduct than Rule 3212. "To establish a claim of negligence, a plaintiff must show (1) that defendant owed plaintiff a duty; (2) that defendant breached that duty; (3) that this breach was the proximate cause of plaintiff[']s injury; and (4) that plaintiff suffered damages." *Kadylak v. Royal Caribbean Cruise, Ltd.*, 167 F. Supp. 3d 1301, 1308 (S.D. Fla. 2016). Importantly, the Rule's strict liability standard is distinct from the reasonable duty of care standard imposed for a negligence claim. *See id.* at 1309 (distinguishing between a strict liability theory and the applicable "ordinary reasonable case" standard). Further, a Rule 3212 violation does not require that the banned substance proximately cause any injury, nor that there be resulting damage to the Authority (or anyone else). Thus, Rule 3212 operates very differently than common law negligence, and the two claims are not analogous.

*Fourth*, a Rule 3212 violation is not analogous to a breach of contract claim. *See* Pl.'s Mot. at 21-22. "The elements of a breach of contract action are (1) a valid contract; (2) a material breach; and (3) damages." *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999). Unlike a breach of contract, a Rule 3212 violation does not require any resulting damage from the presence of a banned substance. And while "[money] damages are always the default remedy for breach of contract," *United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996), a host of equitable remedies are available when Rule 3212 has been violated. *See* HISA Rule 3220. Further, although contract law most obviously promotes the ability of parties to contract to do business, as explained, the HISA Rules (and Rule 3212 in particular) are animated by a different concern: the prevention of tragedies on the track.

If more were needed, Plaintiff's own arguments undermine that the HISA Rules create anything resembling a contractual relationship between the Authority and covered persons like Plaintiff. Plaintiff contends that the HISA registration process provided "no opportunity for any meaningful negotiation," and the Covered Persons Agreement "is not mutually binding," and "imposes no

20

obligation at all on the Authority." Pl.'s Mot. at 35. Given the dynamics Plaintiff identifies in this regulatory scheme, Plaintiff cannot also claim that the Rule 3212 violation he is accused of is comparable to a breach of contract.

*Fifth*, a Rule 3212 violation is not analogous to a tortious interference claim. *See id.* at 22. The elements of a tortious interference claim are (1) "the existence of a business relationship"; (2) "knowledge of the relationship on the part of the defendant"; (3) "an intentional and unjustified interference with the relationship by the defendant"; and (4) "damage to the plaintiff as a result of the breach of the relationship." *Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1279 (11th Cir. 2015). In contrast to Rule 3212, a tortious interference claim imposes scienter requirements as to both the business relationship and the interfering conduct, as well as resulting damages. And while Plaintiff emphasizes the "race[] integrity," and his "competitor's reasonable expectations of fair competition," Pl.'s Mot. at 22, a covered person may be charged with a Rule 3212 violation even if the banned had no impact on the outcome of a race, and even if no competitor suffered any injury.

*Lastly*, Plaintiff cites "strict liability" as a cause of action. Pl.'s Mot. at 22. But "strict liability," is not itself a cognizable cause of action. Instead, it reflects a legal doctrine that holds a party liable for certain types of injuries, regardless of fault, that is incorporated into different contexts such as products liability, abnormally dangerous activity, and possession of wild animals. *See, e.g., Godelia v. Doe 1*, 881 F.3d 1309, 1318 (11th Cir. 2018) ("Florida law recognizes strict liability claims based on a manufacturing defect."); *Koster & Wythe v. Massey*, 293 F.2d 922, 922-23 (9th Cir. 1961) (liability for foreseeable harm irrespective of exercise of due care for ultrahazardous activity of demilitarizing incendiary bombs); *Irvine v. Rare Feline Breeding Ctr., Inc.*, 685 N.E. 2d 120, 123 (1997) (strict liability for possession of wild animal cases). Strict liability does not target *any* type of conduct, much less the presence of a banned substance in a Thoroughbred racehorse. And though Plaintiff briefly mentions "public welfare" offenses, Pl.'s Mot. at 22, he does not explain what those offenses were, or how they target the same conduct at issue here, and the case he cites suggests that this category of offenses post-dates the development of the common law, and stems from "regulation of an administrative character"—not

the common law. *See United States v. Cordoba-Hincapie*, 825 F. Supp. 485, 496 (E.D.N.Y. 1993).

### B.  The public rights doctrine also applies.

Even aside from the arguments above, Plaintiff's Seventh Amendment claim fails for an additional and related reason: the anti-doping and medication control program rules fall within the public rights exception and may be adjudicated within the Executive Branch.

As explained previously, *see supra* pp. 16-21, Rule 3212 does not resemble any pre-existing actions at common law; rather, it seeks to eliminate dangerous medication practices that the common law did not address. Congress understood that while there were tangible motivations behind medicating Thoroughbred racehorses—in many cases, either to enhance their performance, or alleviate pain—unregulated medication had multiple negative consequences, including "mask[ing] minor injuries, making it more difficult to detect relatively insignificant ailments that could lead to fatal injuries if not treated," as well as "caus[ing] significant health problems, including cardiac issues and overexertion," which in turn, skyrocketed accident and injury rates. *See* H.R. 116-554 (Sept. 29, 2020). Thus, in combination, the Act and HISA Rules create an anti-doping and medication control program designed to eliminate these negative consequences.

"In both concept and execution," then, the anti-doping and medication control program is "self-consciously novel." *Jarkesy*, 603 U.S. at 137. Rule 3212 does not "employ the same terms of art" as any common law claim for fraud, breach of contract, or otherwise, *see supra* pp. 16-21, and does not "operate pursuant to similar legal principles" of such claims. *Jarkesy*, 603 U.S. at 134. Instead, the program's central concern—the dangerous medication of Thoroughbred racehorses—was foreign to common law ethos, *see supra* pp. 16-18. This conclusion is consistent with *Jarkesy*'s discussion of an earlier Supreme Court decision, *Atlas Roofing Co. v. Occupational Safety & Health Review Commission*, 430 U.S. 442 (1977), in which the Court held that the adjudication of workplace safety violations could be properly assigned to the Executive Branch because such claims were unknown to the common law. Further, courts evaluating similar regulatory schemes have found that they may be properly adjudicated within the Executive Branch. *See, e.g., Manis*, 796 F. Supp. 3d at 206 ("The Horse Protection Act

22

. . . is a novel regime that brings with it 'no common law soil' and was enacted 'not to enable the Federal Government to bring or adjudicate claims that traced their ancestry to the common law. Rather, Congress, in passing the HPA, permitted USDA to regulate the abuse of horses, a concern foreign to the common law ethos[.]" (quoting *Jarkesy*, 603 U.S. at 136-37); *Axalta Coating Sys. LLC v. FAA*, 144 F.4th 467, 475-77 (3d Cir. 2025) (upholding constitutionality of Executive Branch adjudication of Hazardous Material Transportation safe-shipping violations because the applicable regulatory standards did not "bring common law soil with them" and were "unknown to the common law").

Plaintiff's arguments to the contrary are unavailing. *See* Pl.'s Mot. at 23-27. Nowhere does *Jarkesy* say that the public rights' "historic categories of adjudication" are exclusive. 603 U.S. at 129-30; *see id.* at 130 ("Our opinions governing the public rights exception have not always spoken in precise terms. This is an area of frequently arcane distinctions and confusing precedents."). Further, that *Jarkesy* concludes the public rights doctrine does not necessarily apply to *all* cases concerning Congress's interstate commerce power, *see Jarkesy*, 603 U.S. at 129 n.1, does not mean that Congress can never regulate public rights in the course of regulating commerce. Consider, for instance, matters concerning the regulation of passenger airlines or pilots generally regulated by the Federal Aviation Administration. *See, e.g.*, *Ickes v. FAA*, 299, 263 (3d Cir. 2002); *Northwest Airlines, Inc. v. Minnesota*, 322 U.S. 292, 303 (1944) (Jackson, J., concurring) (planes "move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands"). Those matters and others do not categorically concern rights between individuals that existed at common law simply because they touch upon commerce. And again, though the Act as a whole also strives to preserve the integrity of the sport, the Act and Rule 3212 in particular focus primarily on curbing dangerous medication practices to make the sport safer, and no provisions of the Act regulate betting or create a cause of action or remedy for the betting public. And as explained above, this regulatory scheme (and Rule 3212 in particular) is not analogous to a common law contract cause of action, and Rule 3212 is better understood as a "technical" regulation with no common law origins. *See supra* pp. 20.

**C.  Plaintiffs' state action arguments have been overcome by events.**

Plaintiff's arguments about whether his arbitration was state action, *see* Pl.'s Mot. at 28-30, have been overcome by events. Plaintiff's administrative proceeding is now before the full Commission. The government does not dispute that the Commission's proceeding is state action.[5] The Court should therefore not unnecessarily decide such constitutional issues. *See Arnaiz v. Warden*, 594 F.3d 1326, 1328 n.2 (11th Cir. 2010) ("Constitutional issues should be decided as a last resort.").

**D.  Serpe may have waived his Seventh Amendment jury trial.**

Because the Court has indicated an interest in the issue of whether Plaintiff waived his right to a jury trial, the FTC provides its view here. *See* Order at 27-30, ECF No. 65.

As the Authority explains, *see* Authority Mot. at 24, the knowing and voluntary standard for waiver of the Seventh Amendment right to a jury trial may not even apply to Plaintiff's agreement to arbitrate here. *See id.* (citing *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1370-72 (11th Cir. 2005)); *compare Bakrac, Inc. v. Villager Franchise Sys., Inc.*, 164 Fed. Appx. 820, 823 (11th Cir. 2006) (generally, "[a] party may validly waive its Seventh Amendment right to a jury trial so long as the waiver is knowing and voluntary"). But where that standard does apply, "courts consider the conspicuousness of the waiver provision, the parties' relative bargaining power, the sophistication of the party challenging the waiver, and whether the terms of the contract were negotiable." *Bakrac*, 164 Fed. Appx. at 823-24.

Even assuming that the knowing and voluntary standard applies to the present case, those factors point in both directions. On the one hand, the waiver here was relatively clear. Covered persons who wish to participate in horseracing must register with the Authority via a portal on the Authority's website, *see* JSMF ¶¶ 2-3, registration requires consent to a Covered Persons Agreement, *id.* ¶ 5, and that agreement explains that the covered person agrees to "be subject to and comply with the rules, standards, and procedures developed by HISA and approved by the Federal Trade Commission," *id.* ¶¶ 5-6. As the parties have explained, those procedures provide for arbitration followed by FTC review. Plaintiff is also a sophisticated party who describes himself as a "longtime, successful

---

[5] Instead, as explained above, the FTC's position is that Plaintiff has no right of action until the Commission issues its final decision.

thoroughbred horse trainer," Pl.'s Mot. at 1, and has been represented by counsel throughout all proceedings. Admittedly, the terms of the regulatory scheme are not negotiable, and Plaintiff had no bargaining power setting those terms. But he did have a choice: he could either opt into the scheme and become subject to its rules and procedures, or during the registration process, he could have selected "I Don't Accept," which would have rendered him ineligible to participate in covered horseraces. JSMF ¶ 7.

Additionally, as Plaintiff notes, per the unconstitutional conditions doctrine, "the government may not require a person to give up a constitutional right in exchange for a discretionary benefit where the benefit sought has little or no relation to the right." *Lebron v. Fla. Dep't of Children & Families*, 710 F.3d 1202, 1217 (11th Cir. 2013) (citation modified). Plaintiff has not cited, and the government is not aware, however, of any court to have recognized the unconstitutional conditions doctrine with respect to a Seventh Amendment right to a jury trial where there has been a knowing and voluntary waiver of that right. And although Plaintiff cites cases recognizing the doctrine's application regarding access to federal courts, *see* Pl.'s Mot. at 31 (citing *Sheetz v. Cty. of El Dorado*, 601 U.S. 267, 279 (2024); *Terral v. Burke Constr. Co.*, 257 U.S. 529, 532 (1922)), the Act's review scheme does not require waiver of the right to seek judicial review in an Article III court—as Defendants have maintained throughout this lawsuit, Plaintiff may seek judicial review of a final agency decision once the administrative process concludes.

## III. Plaintiff is not entitled to permanent injunctive relief.

Plaintiff also requests that this Court permanently enjoin his adjudication process. *See* Pl.'s Mot. at 35. To obtain a permanent injunction, a "plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that the remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010).

### A.  Plaintiff has not established irreparable harm.

To start, Plaintiff has not established irreparable harm. The Eleventh Circuit has made clear that "[t]he only areas of constitutional jurisprudence where we have said that an on-going violation may be presumed to cause irreparable injury involve the right of privacy and certain First Amendment claims establishing an imminent likelihood that pure speech will be chilled or prevented altogether." *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000); *see also Lukezic v. FINRA*, 2025 WL 2305859, at *3 (D.D.C. Aug. 10, 2025) (denying preliminary injunction on grounds that private nondelegation and Seventh Amendment claims did not establish irreparable harm). So, to the extent that Plaintiff's arguments rely on prevailing on his constitutional claims alone, they fall short. And though *Axon* held that being subjected "to an unconstitutionally structured decisionmaking process" subjected the plaintiffs in that suit to injury sufficient to establish *jurisdiction*, as this Court has already recognized, "*Axon* did not address the issue of irreparable harm, or any other issue regarding entitlement to injunctive relief." *Serpe v. FTC*, 2025 WL 2840499, at *6 n.4 (S.D. Fla. May 29, 2025); *see also Leachco v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 758 (10th Cir. 2024), *cert. denied*, 145 S. Ct. 1047 (2025) (Mem.).

Further, the Commission has stayed Plaintiff's monetary fine, so he has not been required to pay any money at this point, and indeed, may never have to do so. And to the extent Plaintiff's allegations of irreparable harm stem from his two-year suspension, as this Court has previously explained, the "asserted form of irreparable harm must bear some connection to a party's claim." *Serpe v. FTC*, 2025 WL 4098300, at *10 (S.D. Fla. Oct. 30, 2025). But were the Court to find that Plaintiff prevailed on either his private nondelegation or Seventh Amendment claim in a way that was not connected to his suspension, that suspension would not provide a basis for entry of injunctive relief. As the FTC has previously argued, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018) (citation omitted), and even if Plaintiff could "demonstrate harm from one particular inadequacy in government administration," that provides no basis for the Court to enter an injunction "to remedy *all* inadequacies in that administration," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006); *see also Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1127

26

(11th Cir. 2005) ("[A]ny motion or suit for . . . [a] permanent injunction must be *based upon a cause of action*. . . . There is no such thing as a suit for a traditional injunction in the abstract." (emphasis added) (citation omitted)); *Kaimowitz v. Orlando, Fla.*, 122 F.3d 41, 43 (11th Cir. 1997) (explaining a court "should not issue an injunction when the injunction in question is not of the same character, and deals with matters lying wholly outside the issues in the suit"); *Colo. River Indian Tribes v. Marsh*, 605 F. Supp. 1425, 1440 (C.D. Cal. 1985) ("[I]rreparable injury must be causally connected to the [legal] violation.").

### B. An injunction would be contrary to the public interest.

The third and fourth injunction factors "merge" when an injunction is sought against the government, *see Nken v. Holder*, 556 U.S. 418, 435 (2009), and here, an injunction would be against the public interest. There is a strong public interest in permitting Plaintiff's administrative proceedings to move forward as contemplated by Congress. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (citation modified)); *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008) ("[T]here is inherent harm to the agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop and enforce."). That is particularly the case because Congress adopted the Act's scheme to address the substantial health and safety concerns created by doping. To enjoin Plaintiff's proceedings at this juncture—before the Commission has the chance to issue its final decision—would undermine those important interests by undercutting the effectiveness of the Act's oversight regime. And further, any cognizable harm to Plaintiff is counteracted by the fact that Plaintiff can seek judicial review of any FTC final order. *See* 15 U.S.C. § 3058; 5 U.S.C. § 704 ("[F]inal agency action for which there is no other adequate remedy in a court are subject to judicial review.").

## CONCLUSION

For the above reasons, the Court should enter summary judgment for the Defendants and deny Plaintiff's summary judgment motion.

Dated: March 23, 2026                          Respectfully submitted,


                                               BRETT A. SHUMATE
                                               Assistant Attorney General
                                               Civil Division

                                               CHRISTOPHER HALL
                                               Assistant Branch Director
                                               Civil Division, Federal Programs Branch

                                               */s/ Taylor Pitz*
                                               TAYLOR PITZ
                                               CA Bar No. 332080
                                               Trial Attorney
                                               United States Department of Justice
                                               Civil Division, Federal Programs Branch
                                               1100 L Street, N.W.
                                               Washington, DC 20005
                                               Phone: (202) 305-5200
                                               E-mail: taylor.n.pitz@usdoj.gov

                                               *Counsel for the FTC*

28

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2026, I caused the foregoing document to be electronically filed with the Court using the ECF system, which will send notification of such filing to all attorneys of record.

*/s/ Taylor Pitz*
TAYLOR PITZ
Trial Attorney
U.S. Department of Justice